# Illinois Official Reports

## Appellate Court

*In re Tamesha T.*, 2014 IL App (1st) 132986

| | |
|---|---|
| Appellate Court Caption | *In re* TAMESHA T., JACOB T., EMMANUEL T., JEREMIAH T., ANGEL S., MALACHI T., Minors, Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. Dana S., Respondent-Appellant). |
| District & No. | First District, First Division <br> Docket No. 1-13-2986 |
| Filed | July 28, 2014 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an appeal from the adjudication and disposition orders finding that respondent's children were neglected and abused and making them wards of the court under the guardianship of the Department of Children and Family Services, the appellate court held that the trial court did not abuse its discretion or prejudice respondent by questioning witnesses during the hearing, since the trial court never abandoned its role as judge or assumed the role of an advocate for any party; rather, the court attempted to ascertain the evidence necessary to adjudicate the claims it faced, and the resulting findings of abuse and neglect were not contrary to the manifest weight of the evidence, especially in view of the testimony that the home was an injurious environment for the children and that the mother was not making progress in improving her abilities with respect to providing a "safe and nurturing shelter" for her children. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 12-JA-870 through 12-JA-874, 12-JA-1102; the Hon. Robert Balanoff, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Bruce H. Bornstein, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Nancy Kisicki, and Nichole Lucero, Assistant State's Attorneys, of counsel), for the People. |
| | |
| | Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Christopher Williams, of counsel), guardian *ad litem*. |
| | |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion. |
| | Justices Hoffman and Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1     This appeal arises from the August 12, 2013 adjudication and disposition orders entered by the circuit court of Cook County, which found respondents Tamesha T. (Tamesha), Jacob T. (Jacob), Emmanuel T. (Emmanuel), Jeremiah T. (Jeremiah), Angel S. (Angel), and Malachi T. (Malachi) to be neglected and abused, and which adjudged them wards of the court under the guardianship of the Illinois Department of Children and Family Services (DCFS). On appeal, the minors' mother, respondent Dana S. (Dana), argues that: (1) the circuit court abused its discretion and prejudiced her by its questioning of the witnesses during the adjudication hearing; and (2) the evidence was insufficient to support the circuit court's findings of neglect and abuse. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                    BACKGROUND

¶ 3     Dana is the biological mother of Tamesha, Jacob, Emmanuel, Jeremiah, Angel and Malachi. Angel, whose putative father is Jermaine S. (Jermaine), was born on September 3, 2002. Emmanuel was born on April 9, 2004, Jacob was born on November 19, 2005, Tamesha was born on October 30, 2006, and Jeremiah was born on February 23, 2011. Twan T. (Twan) is the putative father of Emmanuel, Jacob, Tamesha, and Jeremiah. Malachi was born on October 23, 2012, and his legal father is Marvell S. (Marvell).[1] Four of the six children have special needs.

---

[1] It is unclear in the record as to why Malachi's last name begins with the letter "T," despite Dana and Marvell's last name of "S." Jermaine, Twan and Marvell are not parties to this appeal.

¶ 4 In March 2012, DCFS became involved with the family after receiving two hotline telephone calls.[2] The first hotline call alleged that, on March 12, 2012, when a bus driver came to pick Tamesha and Jacob up from the family home for school, neither child was waiting outside and no one answered the door. As the bus was leaving, then five-year-old Tamesha and six-year-old Jacob came around the corner. Tamesha was wearing a coat with nothing underneath the coat, as well as mismatched shoes. Jacob was minimally dressed in a thin T-shirt and gym shoes. The children informed the bus driver that their mother was at the laundromat. The second hotline call alleged that none of the children ever went to school and that the family lived in a home full of bugs and rodents. On March 17, 2012, DCFS received a third hotline call, which reported that the police had been notified that the children were found naked and playing outside on the window ledge of the family's third-floor apartment. Investigators found the home to be unsafe, discovered butcher knives on the floor of the home, and discovered that Dana was taking a bath with her youngest child while her other children were playing on the window ledge. Thereafter, the police arrested and charged Dana with child endangerment, to which she pled guilty on April 26, 2012, and the children were removed from the home.[3] Although the children were temporarily removed from the home in March 2012, they were soon returned to Dana's care.[4]

¶ 5 On about March 20, 2012, DCFS opened an "intact case" and offered support services to Dana, including homemaker's services, parenting classes, and individual therapy. On September 6, 2012, the State filed a petition for adjudication of wardship (petition for adjudication) for each child, alleging that Tamesha, Jacob, Emmanuel, Jeremiah and Angel were abused due to a substantial risk of physical injury (705 ILCS 405/2-3(2)(ii) (West 2012)), and neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2012)) and lack of necessary care (705 ILCS 405/2-3(1)(a) (West 2012)), on the bases that Dana failed to make progress in DCFS services, that she had been psychiatrically hospitalized due to "homicidal ideations towards her unborn child," that she had previously pled guilty to a charge of child endangerment, and that the family home was filthy. On that same day, September 6, 2012, the State filed motions for temporary custody, requesting that these five children be placed in temporary custody of a legal guardian because probable cause existed that they were neglected and abused. The circuit court granted the motion for temporary custody, appointed temporary custody to DCFS, and appointed a public guardian and guardian *ad litem* (GAL) for the five children.

¶ 6 On October 23, 2012, Dana's sixth child, Malachi, was born. On October 30, 2012, the State filed another petition for adjudication, alleging that Malachi was abused due to a substantial risk of injury (705 ILCS 405/2-3(2)(ii) (West 2012)) and neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2012)), on the bases that Dana failed to make progress in DCFS services, that she had previously pled guilty to a charge of child

[2]Malachi had not yet been born at this time.

[3]Although the details are unclear in the record, it appears that some of the minors were placed with Lydia House at the Safe Families for Children organization.

[4]The reasons are not apparent in the record as to why or how Dana regained custody of her children or on what date the minors were eventually returned to Dana's care.

endangerment, and that she and Malachi's father had a history of domestic violence. On that same day, October 30, 2012, the State filed a motion for temporary custody, requesting that Malachi also be placed in temporary custody of a legal guardian. The circuit court then granted the October 30, 2012 motion and appointed DCFS temporary custody over Malachi.

¶ 7        On August 12, 2013, an adjudication hearing commenced, during which both Dana and Marvell were present. At the start of the hearing, the circuit court admitted into evidence, without objection, six exhibits presented by the State: (1) a certified statement of conviction for Dana's guilty plea of child endangerment (People's Exhibit 1); (2) certified and delegated "individual counseling & family behavioral therapy preliminary report" from Mary & Tom Leo Associates, Inc. counseling services (People's Exhibit 2); (3) certified and delegated case notes from At Home Health Services (People's Exhibit 3); (4) a certified and delegated record of a psychological evaluation performed by Dr. Kyle Hunneke (People's Exhibit 4); (5) certified and delegated medical records from Saint Bernard Hospital, where Dana had been involuntarily hospitalized for psychiatric evaluation in September 2012 (People's Exhibit 5); and (6) certified and delegated medical records from Illinois Medical Center of Chicago, where Dana had been voluntarily hospitalized for psychiatric treatment after her involuntary hospitalization at Saint Bernard Hospital in September 2012 (People's Exhibit 6).

¶ 8        Deborah Jackson-Crawford (Jackson-Crawford) testified on behalf of the State that she was a DCFS "intact worker" who was assigned to the family's case from the period of time when DCFS first became involved with the family until the time Dana's children were taken into DCFS protective custody in September 2012. She testified that on April 5, 2012, she met with Dana and recommended support services to her, including participation in a psychological evaluation, parenting classes, parenting coaching, and enrollment in a homemaker service. Jackson-Crawford explained that the purpose of the homemaker service was to help Dana learn how to keep the house clean, how to be consistent with the children, what to do when the children awoke in the morning or afternoon, how to prepare meals, and how to organize her finances. The homemaker visited the family every weekday. Although Dana completed the psychological evaluation and the parenting classes, she was still in need of homemaker services and parenting coaching at the time her children were placed into protective custody. Jackson-Crawford testified that, on May 22, 2012, she met with Twan, the father of Emmanuel, Jacob, Tamesha, and Jeremiah, who informed her that he was incapable of taking care of his children and that there were issues of domestic violence between him and Dana. She recommended certain DCFS support services to Twan, who failed to participate in any. After Jackson-Crawford's meeting with Twan, she determined that Dana was also in need of domestic violence counseling, for which she did not immediately enroll Dana so as not to overwhelm her. During her time as the family's DCFS caseworker, Jackson-Crawford visited Dana's home nearly every weekday, but in August 2012, Dana disappeared with her children for nearly three weeks and did not participate in any services during that time. Jackson-Crawford further testified that on September 4, 2012, she and a DCFS investigator visited Dana's home, where she had the opportunity to observe the minors and the conditions of the home. Despite the fact that the homemaker services were still in place on September 4, 2012, she described the home as "unclean," stating that there was food all around the kitchen and on the floor, that there was a diaper with feces on it in one of the back rooms, that there were clothes all over the back porch and in the bathtub, and that there were clothes everywhere in the front room where the children slept with Dana on mattresses. Jackson-Crawford also had

some concerns about Angel, who was autistic, because Dana wanted to home-school her. However, Angel was eventually enrolled in school. At the end of the State's direct examination of Jackson-Crawford, the circuit court posed several questions to the witness. Specifically, the court asked whether Dana's other children were also enrolled in school, to which Jackson-Crawford replied in the affirmative. The court then asked whether the minors were supposed to be in school on September 4, 2012, to which Jackson-Crawford stated, "No[,] *** if I recall, school was just beginning." Upon the court's questioning as to why she did not require Dana to engage in domestic violence services, Jackson-Crawford stated that she did not want Dana to be overwhelmed, that there was instead an immediate need for parenting coaching and homemaker services, and that it was also unclear at the time if Dana was in a relationship with anyone. The court then asked why the children were taken into protective custody by DCFS, and Jackson-Crawford testified that Dana was no longer cooperating with the services and had disappeared with the children for almost three weeks without participating in any services. When the court asked whether Dana applied the skills she learned in parenting class at home, Jackson-Crawford answered no. The court then questioned Jackson-Crawford about the homemaker services, to which she testified that the homemaker was at Dana's home for about four hours on weekdays, that "Monday through Friday pretty much the house was fine, but then on Monday we had to start all over again because [the homemaker] was not there on Saturday or Sunday."

¶ 9 On cross-examination by Dana's counsel, Jackson-Crawford testified that Dana successfully completed parenting classes at Mercy Hospital, but that she was inconsistent with her participation in parenting coaching services that were offered to her because the parenting coach had difficulty getting into Dana's apartment and Dana "didn't always let her in." With regard to the homemaker services, Jackson-Crawford testified that the homemaker's duties were to help Dana learn how to keep her house clean, how to keep her children on a consistent schedule, and how to prepare meals for the children. The circuit court then interjected and asked if Jackson-Crawford had ever observed the homemaker instruct Dana, to which she testified that she had "a lot," that Dana was able to follow the homemaker's instructions while the homemaker was present, but that after the weekend they had to "start all over again." When the homemaker was present, the home was clean, but Dana "did not understand that she needed to *** do laundry every week." Dana also did not understand that she "didn't always have to feed the children from restaurants" and that she could cook meals for them instead. When Dana's counsel asked whether Dana made progress in services from April 25, 2012 to September 4, 2012, Jackson-Crawford testified that Dana was "not consistent." The circuit court then asked whether Dana had completed the parenting classes, to which Jackson-Crawford testified that Dana did not go to class on the first day, that Jackson-Crawford had to go to the home and reinstruct Dana to go to the classes with baby Jeremiah, but that Dana failed to take Jeremiah with her to every class. However, Dana eventually completed the parenting classes successfully. The court also asked about the parenting coaching services, to which Jackson-Crawford replied that Dana was inconsistent with her participation in those services because Dana would not allow the parenting coach into her home for weeks at a time. Upon questioning by the court, Jackson-Crawford explained that Dana was not referred for domestic violence counseling because Dana had not consistently cooperated with the parenting coaching services, and that Dana did not start individual counseling because she had not progressed enough in the parenting coaching services.

Although Dana never refused to engage in the support services, she sometimes "didn't show up for them or she wasn't around for the services."

¶ 10    On redirect examination, Jackson-Crawford clarified that the purpose behind the homemaker services was not to provide a "maid" but, rather, to aid a parent with time management, financial management, and scheduling for the day-to-day operations of taking care of the children and running the home. She stated that it was Dana's responsibility, not the homemaker's responsibility, to clean her home. Jackson-Crawford testified that Dana should have incorporated the skills she learned from the homemaker over the weekends, but that every Monday, Dana's home usually returned to a disorganized and deteriorated state. She testified that she consulted with the DCFS homemaker about the homemaker's observations and the conditions of the home every day. Upon questioning by the court, Jackson-Crawford testified that the homemaker services had been in place for at least six weeks. She further testified that the homemaker had trouble gaining entry into the home on some days and that Dana had once informed Jackson-Crawford that she "didn't feel like being bothered." On recross by Dana's attorney, Jackson-Crawford testified that she was not present in Dana's home every Monday morning.

¶ 11    A psychological evaluation of Dana, which was admitted into evidence as People's Exhibit 4, stated that although she took some responsibility for her children's involvement in DCFS care, she "tended to have limited insight and awareness into her struggles." The psychological evaluation described Dana as having "significant cognitive deficits" that are "life-long in nature and will affect her future ability to problem solve and make decisions as a parent." The evaluation also noted that all of Dana's children required special education services in their school; that Dana was hospitalized when she was 12 or 13 years old after "expressing homicidal ideation toward another youth"; and that Dana's mother had cared for three of Dana's children until September 2011. The psychological evaluation recommended that Dana participate in the same services recommended by DCFS.

¶ 12    A preliminary counseling report from Mary & Tom Leo Associates, Inc., which was admitted into evidence as People's Exhibit 2 and detailed the family's counseling sessions between June 2012 and August 2012, stated that Dana only attended 10 of the 18 scheduled sessions. The preliminary report noted that Dana seemed to be overwhelmed with providing a nurturing and safe environment for the minors; that Dana admitted to becoming stressed in trying to meet each child's needs; and that the therapist developed a weekly schedule for Dana and her family on three separate occasions, but each time Dana claimed to have lost the schedule or just did not implement it. The preliminary report further described Dana's struggles with financial planning, stating that, although Dana had received approximately $3,500 in social security benefits for August 2012, she only had $100 remaining by the end of the first week of August and could not account for approximately $1,500 of those funds. The preliminary report also noted that Dana was only able to provide a limited amount of food for her children due to the lack of funds.

¶ 13    Case notes from At Home Health Services, which were admitted into evidence as People's Exhibit 3, detailed the homemaker's observations of Dana's home between June 2012 and September 2012. Although the homemaker's comments in the case notes were generally positive throughout June and July 2012, she described Dana's house as "a mess" in August 2012 and noted that Dana refused the DCFS caseworker, Jackson-Crawford, entry into the home on one occasion. The case notes revealed that, on August 21, 2012, every room in the

home was dirty, the children were not clean, and the homemaker suggested to Dana that the children needed baths. Dana then put four children together into the bathtub and, when the homemaker later checked on them, the water had turned black and the children were all sharing one towel. The August 27, 2012 case notes revealed that the homemaker observed Dana to be "out of it"; that the children were not clean; that the homemaker noticed Angel's vagina to be swollen; that the homemaker asked Angel if anyone had touched her privates, to which Angel said "yes mama Dana is going to be mad"; and that Emmanuel informed the homemaker that he did not want to stay with Dana because he was "afraid mommy Dana is going to get hurt by a man." The homemaker then notified DCFS of her observations. The case notes between September 1, 2012 and September 4, 2012 stated that Dana did not clean the house despite the homemaker's instructions to do so; that Dana seemed stressed out and overwhelmed; that Dana's attitude had changed for the worse within the past three weeks; and that the kitchen was the filthiest it had ever been at the time the children were taken into protective custody by DCFS.

¶ 14    De-Borah Armand (Armand), a DCFS child protection specialist, testified for the State regarding the events of September 4, 2012, when DCFS took protective custody of the minors. She testified that the case involving Dana's family came to her attention on August 24, 2012. On August 27, 2012, she met Dana at her home and observed that the home was not in a deplorable state and "was not totally, totally out of order." Armand noticed that Angel exhibited some developmental delays and that she could not form complete sentences. Dana denied that she had any domestic violence issues at that time, and informed Armand that she was participating in all of the required support services. Following Armand's August 27, 2012 visit, Dana left the home with her children for a few days. Armand testified that on September 4, 2012, during another visit to Dana's home, Dana answered the door in her underwear. Armand stated that Jackson-Crawford and the homemaker were also present at Dana's home. Armand observed the home to be "pretty messy" and unclean, and that leftover dishes, food in bowls, used dishes, and clothes covered the floor. She further noticed that the children were unclean and that half of them were undressed. Armand testified that she was concerned about the conditions of the home. As a result of the risk to the children under Dana's care, Armand took protective custody of the five children.[5]

¶ 15    On cross-examination, Armand testified that, during her August 27, 2012 visit to Dana's home, she noticed that the home had a bed, a mattress, a kitchen table, chairs, and sufficient food in the refrigerator. Armand opined that she did not see any "environmental neglect" on August 27, 2012, that she did not see the need to take protective custody of the children on that date, but that the condition of the home on September 4, 2012 was "totally different from August 27th." She testified that, on September 4, 2012, she noticed cereal bowls with milk and food in them under the dining room table, observed unwashed dishes in the sink, but did not smell any sour milk. The circuit court then asked whether there was sufficient food in the house to feed the children, to which Armand answered in the affirmative. Upon further questioning by the court, Armand estimated that the mess in the house could have been picked up in two hours. Armand further testified that she did not take any photographs of the home during her visits. On redirect examination, Armand testified that there was only one mattress in the home for the entire family. The court then asked about the location and size of the mattress,

_____

[5]As noted, Malachi had not yet been born in September 2012.

to which Armand answered that it was located in a bedroom and appeared to be a queen-sized mattress. Armand further informed the court that there was a crib in the house.

¶ 16     The State and the GAL then rested, and counsel for Dana also rested without presenting any evidence. Following the parties' arguments, the circuit court entered an adjudication order, finding that the State had proven by a preponderance of the evidence that all of the children were neglected due to an injurious environment and abused due to a substantial risk of physical injury. The adjudication order also found that all of the children, except for Malachi, were neglected due to a lack of necessary care. In making its ruling, the circuit court stated that there was domestic violence in the home, that Dana had been convicted of child endangerment, that "[s]he has failed to complete the intact services and progress [in] the intact service," that the only reason she did not complete domestic violence services or individual counseling services was "because she delayed doing all of the other services and these would have been started presumably during that time." The court then made a finding that Marvell was a non-custodial parent at all relevant times, and admonished Dana that she must cooperate with DCFS, comply with the terms of the service plan, and correct the conditions that led to her children being placed under DCFS care.

¶ 17     On that same day, August 12, 2013, following a disposition hearing, the circuit court found that it was in the children's best interest to be adjudged wards of the court and to be placed in the guardianship of DCFS "with right to place the minor[s]." The circuit court found that Dana was unable, not unwilling, to care for the children. The circuit court then entered a permanency order of "return home within 12 months."

¶ 18     On September 11, 2013, Dana filed a timely notice of appeal.

¶ 19                                                    ANALYSIS

¶ 20     We determine the following issues: (1) whether the circuit court abused its discretion and prejudiced Dana by its questioning of the witnesses during the adjudication hearing; and (2) whether the circuit court erred in finding that the minors were neglected and abused.

¶ 21     We first determine whether the circuit court abused its discretion and prejudiced Dana by its questioning of the witnesses during the adjudication hearing, which we review under an abuse of discretion standard. See *In re Maher*, 314 Ill. App. 3d 1088, 1097 (2000).

¶ 22     Dana argues that the circuit court's questioning of the witnesses during the adjudication hearing denied her a fundamental right. Specifically, she contends that the circuit court's questions were neither brief, neutral in character, nor for clarification purposes, but were propounded by the court to elicit testimony that was favorable to the State. She maintains that, in essence, the circuit court abandoned its function as a neutral trier of fact and became an extension of the State during the hearing. Dana argues that the court's adversarial questioning, including interrupting her counsel during cross-examination of State witnesses, was an abuse of the court's discretion that prejudiced her. Dana cites *In re R.S.*, 117 Ill. App. 3d 698 (1983), for support.

¶ 23     The public guardian counters that Dana forfeited this issue for review on appeal because she failed to object to the circuit court's questions at the adjudication hearing and that the plain error doctrine does not apply to circumvent forfeiture. Even if not forfeited, the public guardian argues that the circuit court's lines of questioning were permissibly aimed at clarifying the evidence and there was no danger of prejudice to Dana in light of the fact that no

jury was involved in the adjudication hearing. The public guardian further posits that the circuit court acted within its discretion in questioning the witnesses, where the court had statutory authority to do so. The public guardian argues that, even if the circuit court erred in questioning the witnesses, such error was harmless in light of the overwhelming evidence of abuse and neglect that were presented at the adjudication hearing.

¶ 24    The State argues that the circuit court's questioning of the witnesses was neither an abuse of discretion, nor did it prejudice Dana. The State adopts the public guardian's arguments, with the exception of the forfeiture arguments, in support of its position on this issue.

¶ 25    As a preliminary matter, we address the public guardian's contention that Dana has forfeited review of this issue on appeal. Generally, an issue that was not objected to at trial and raised in a posttrial motion is forfeited on appeal. *People v. Faria*, 402 Ill. App. 3d 475, 477 (2010). However, application of the forfeiture rule is less rigid where the basis of the objection is the circuit court's own conduct. *In re Maher*, 314 Ill. App. 3d at 1097. Specifically, "where the trial court departs from its role and becomes an advocate for the State's position, no objection by opposing counsel is necessary to preserve the issue for review." *Id.* While we do not say that the circuit court abandoned its neutrality, in the interest of providing all parties the opportunity to be heard, we choose to examine this issue on appeal.

¶ 26    A trial judge may question witnesses to elicit truth, clarify ambiguities in the witnesses' testimony, or shed light on material issues. *Obernauf v. Haberstich*, 145 Ill. App. 3d 768, 771 (1986); Ill. R. Evid. 614(b) (eff. Jan. 1, 2011) (the court may interrogate witnesses). However, the trial court must not depart from its function as a judge and may not assume the role as an advocate for either party. *Faria*, 402 Ill. App. 3d at 479. The trial judge is given wider latitude in examining witnesses in bench trial, where the risk of prejudice is less and the court's inquiries are compatible with its role as fact-finder. *Obernauf*, 145 Ill. App. 3d at 771. "The propriety of an examination of a witness by the trial court must be determined by the circumstances of each case and rests within the discretion of the trial court." *In re Maher*, 314 Ill. App. 3d at 1097.

¶ 27    Based on our review of the record, we find that the circuit court's questioning of the State's witnesses was not an abuse of discretion. The record shows that, at the end of the State's direct examination of Jackson-Crawford, the circuit court posed several questions to the witness that elicited the truth, clarified her testimony, and shed light on material issues regarding the minors. Specifically, the court asked whether Dana's other children, aside from Angel, were enrolled in school and whether the minors were supposed to be in school on the day DCFS took protective custody of them. The court also asked other open-ended and clarifying questions, such as why Dana was not required to engage in domestic violence services, why DCFS took protective custody of the children, whether Dana applied the skills she learned in parenting class at home, and the logistics of the homemaker's services. During cross-examination of Jackson-Crawford, the circuit court interjected counsel's inquiries by asking the witness whether she had ever observed the homemaker instruct Dana at home, whether Dana had completed parenting classes, as well as Dana's level of participation in the parenting coaching services. On redirect examination of Jackson-Crawford, the circuit court asked how long the homemaker services had been in place for Dana. Likewise, during cross-examination of Armand, the circuit court interjected by asking whether there was sufficient food in the house to feed the children, as well as other clarifying questions regarding the extent of the mess in the home and the location and size of the mattress in the home. We cannot say, based on our

examination of the record, that the circuit court's lines of questioning impermissibly assumed the role of an advocate for the State or public guardian, nor could we conclude that such questioning prejudiced Dana or was done in any way but a fair and impartial manner. The circuit court's open-ended questions were designed to elicit further information that was essential to the adjudication of the issues before the court, and the questions could just as easily have elicited responses from the witnesses that were favorable to Dana. See *People v. Taylor*, 357 Ill. App. 3d 642, 648 (2005) (" ' "[i]t is the judge's duty to see that justice is done, and where justice is liable to fail because a certain fact has not been developed or a certain line of inquiry has not been pursued it is his duty to interpose and either by suggestions to counsel or an examination conducted by himself avoid the miscarriage of justice" ' " (quoting *People v. Rega*, 271 Ill. App. 3d 17, 23 (1995), quoting *People v. Lurie*, 276 Ill. 630, 641 (1917))). Indeed, the record shows that the witnesses' responses to some of the court's questions were actually favorable to Dana–that is, the children were in fact enrolled in school; the minors did not have to be in school on September 4, 2012 because school was "just beginning"; Dana had not yet been required to engage in domestic violence services; Dana had successfully completed parenting classes; there was sufficient food in the house for the children on September 4, 2012; and the mess in the home could have been remedied in two hours.

¶ 28   Moreover, we find that, under section 1-2(2) of the Juvenile Court Act of 1987 (the Act), the circuit court had statutory authority to "direct the course" of all proceedings under the Act "so as promptly to ascertain the jurisdictional facts and fully to gather information bearing upon the current condition and future welfare of persons subject to this Act." 705 ILCS 405/1-2(2) (West 2012); see generally *In re Estate of Wilson*, 238 Ill. 2d 519, 555-56 (2010) (court's role in guardianship proceedings differs from its customary function in civil and criminal proceedings (citing *In re Patricia S.*, 222 Ill. App. 3d 585, 592 (1991) (Under the Act, "unlike its customary role in civil or criminal proceedings, the court cannot sit passively and await the parties' presentation of evidence. Instead, the Act requires that it must act affirmatively, and perhaps at times aggressively, to ferret out information before it can decide that a child's interest is better served by removal from the family.")))). In light of the serious nature of the proceedings and the potential impact on the lives of the children, based on our review of the record, we find that the court, through its questioning of the witnesses, did nothing more than gather information and clarify issues bearing upon the welfare of the minors.

¶ 29   Nonetheless, Dana cites *In re R.S.*, 117 Ill. App. 3d 698, in support of her position that the circuit court's questioning of the witnesses was reversible error because it helped established the State's case that the minors were abused and neglected by eliciting damaging evidence against Dana. We find *In re R.S.* to be factually distinguishable from the case at bar. *In re R.S.* involved a situation in which the court took on the role of prosecutor by twice calling the minor's accomplice to testify as a witness, who was not included in the State's list of witnesses but whom the court knew was involved in the incident during a previous court appearance on charges against the accomplice. *Id.* at 704. The court specifically commented that it was unusual that the accomplice had not been called to testify since he had admitted to being at the crime scene at his prior adjudication hearing. *Id.* at 702. The court believed that the witness knew whether R.S. was a participant in the crime, held the accomplice in contempt when he refused to answer the court's question, and later elicited testimony from the accomplice that incriminated R.S. *Id.* at 704. In reversing the circuit court's ruling on appeal, this court found

that, under the circumstances, the circuit court exceeded the bounds of judicial discretion by calling the accomplice to testify, and impermissibly helped establish the State's case against the minor. *Id.* at 704-05.

¶ 30    Unlike *In re R.S.*, in the instant case, the circuit court did not call witnesses, but merely posed some clarifying questions to the witnesses who were already testifying. The court's questions were clearly aimed at clarifying evidence that had already been presented at the adjudication hearing–such as those relating to the nature of the homemaker services and other support services, the extent of the mess in Dana's home, and the furniture and food in the home. All of these factors relate to the environment in which these very young children, some of whom had special needs, were to live or not as the court determined. Unlike *In re R.S.* in which the court elicited answers from the accomplice that directly implicated the minor, here, the court's questioning did not indicate a bias for any party but, rather, a conscious effort to ascertain the evidence necessary to adjudicate the claims before it. As noted, the questions posed by the circuit court could easily have elicited testimony favorable to Dana, and, in fact, some of the witnesses' responses to the court's questions did bolster Dana's position. Thus, we find that, under the circumstances, the circuit court's questioning did not prejudice Dana and the court neither abandoned its role as judge nor assumed the role of an advocate for any party. Therefore, we hold that the circuit court did not abuse its discretion in questioning the witnesses during the adjudication hearing.

¶ 31    We next determine whether the circuit court erred in finding that the minors were neglected and abused. On review, we will not disturb the circuit court's determinations of abuse and neglect unless they are against the manifest weight of the evidence. See *In re Juan M.*, 2012 IL App (1st) 113096, ¶ 49. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.*

¶ 32    Dana argues that the evidence presented at the adjudication hearing was insufficient to support the circuit court's findings of abuse and neglect. Specifically, she contends that although she pled guilty to a misdemeanor of child endangerment in April 2012, the minors were subsequently returned to her custody. She maintains that, based on Armand's testimony, DCFS basically took protective custody of her children because of a messy home, and that Armand's observations of the children and the condition of the home on September 4, 2012 were not sufficient proof of abuse or neglect. Dana further argues that it was reasonable for her, as a single mother of multiple children, to have a messy home. She also argues that, in making its findings, the circuit court ignored certain facts that were favorable to her–such as that there was sufficient food in the home, that there was no evidence of malnourishment, that there was no testimony that the minors were unhappy or did not love Dana, and that there was no evidence that Malachi was born with any special needs or had been exposed to drugs or alcohol.

¶ 33    The State counters that the circuit court's findings of abuse and neglect were not contrary to the manifest weight of the evidence, by arguing that the evidence in support of the court's findings was overwhelming. The State argues that the record reveals not only that Dana's home was an injurious environment for the minors, but that her lack of progress in the support services placed the children at substantial risk of injury. The State contends that Dana's attempts to downplay the state of "messiness" in the home is contradicted by the testimony and the exhibits presented at the adjudication hearing, both of which demonstrate a steady deterioration in Dana's ability to care for the children.

- 11 -

¶ 34    The public guardian argues that the circuit court's adjudicatory findings of abuse and neglect were supported by the evidence, by pointing out that Dana omits a wide range of significant facts in her factual statement and arguments before this court. The public guardian contends that the evidence shows that Dana failed to provide a "safe and nurturing shelter" to her children, that Dana's refusal to fully cooperate and her inability to make progress in the support services show the neglect the minors experienced under her care, and that, under the totality of the circumstances, the evidence demonstrates an injurious environment for the minors. The public guardian further posits that the evidence, in the cumulative, shows that the minors did not receive the necessary support and remedial care they required and that the injurious environment created by Dana also constituted abuse due to "substantial risk of physical injury."

¶ 35    In the instant case, on September 6, 2012, the State filed a petition for adjudication for each of Tamesha, Jacob, Emmanuel, Jeremiah, and Angel, alleging that they were abused due to a substantial risk of physical injury (705 ILCS 405/2-3(2)(ii) (West 2012)), and neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2012)) and lack of necessary care (705 ILCS 405/2-3(1)(a) (West 2012)), on the bases that Dana failed to make progress in DCFS services, that she had been psychiatrically hospitalized due to "homicidal ideations towards her unborn child," that she had previously pled guilty to a charge of child endangerment, and that the family home was filthy. On October 30, 2012, a week after Malachi was born, the State filed a second petition for adjudication, alleging that Malachi was abused and neglected, on the bases that Dana failed to make progress in DCFS services, that she had previously pled guilty to a charge of child endangerment, and that she and Malachi's father had a history of domestic violence. Following the adjudication hearing, the circuit court entered an order finding that the State had proven by a preponderance of the evidence that all of the children were neglected due to an injurious environment and abused due to a substantial risk of physical injury. The circuit court also found that all of the children, except Malachi, were neglected due to a lack of necessary care.

¶ 36    Section 2-3(1)(a) of the Act defines a neglected minor to include one "who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter." 705 ILCS 405/2-3(1)(a) (West 2012). "Neglect" is generally defined as:

"the failure to exercise the care that circumstances justly demand and includes both willful and unintentional disregard of parental duties. [Citation.] The term is not a 'fixed and measured meaning' and it takes its content from specific circumstances of each case. [Citation.] Accordingly, cases involving an adjudication of neglect and wardship are *sui generis*, and each case must be decided on the basis of its own unique circumstances. [Citation.]" *In re Christopher S.*, 364 Ill. App. 3d 76, 88 (2006).

The focus of our inquiry is whether the minors are neglected, not whether the parents are neglectful. See *In re Arthur H.*, 212 Ill. 2d 441, 467 (2004). The State has the burden to prove the allegations by a preponderance of the evidence. *In re Christopher S.*, 364 Ill. App. 3d at 86.

¶ 37    We find that the evidence supports the circuit court's finding that all of the children, except Malachi, were neglected due to a lack of necessary care. The record shows that, beginning in March 2012, over the course of several months, Tamesha, Jacob, Emmanuel, Jeremiah, and Angel were observed to be in various situations indicating that they lacked the necessary

support and care from Dana. During the winter, in March 2012, a school bus driver observed Tamesha wearing a coat with nothing underneath the coat, while Jacob was minimally dressed in a thin T-shirt and gym shoes. On one occasion, the children were found naked and playing outside on the window ledge of the family's third-floor apartment. Evidence was also presented at the adjudication hearing that Dana pled guilty to child endangerment in April 2012. At the adjudication hearing, Jackson-Crawford testified to Dana's lack of progress in her participation in the support services, stating that she did not apply the skills that she learned from parenting classes at home; that she did not apply the skills that she learned from the homemaker on the weekends; that Dana sometimes refused to allow the parenting coach into the home to help her; that she disappeared with the children for nearly three weeks without notifying DCFS and did not participate in any services during that time; that Dana could not engage in domestic violence services because she had not consistently cooperated with the parenting coaching services; and that Dana was still in need of homemaker and parenting coaching services, though she was no longer cooperating with those services, at the time the minors were placed into protective custody. Jackson-Crawford also testified to her observations of the conditions of the home on September 4, 2012, by describing the home as unclean. She testified that, despite the fact that the homemaker services were still in place at that time, there was food all around the kitchen and on the floor, there was a diaper with feces on it in one of the rooms, and there were clothes all over the back porch and bathtub. Similarly, Armand testified that, on September 4, 2012, the home was messy and unclean; the floor was covered with dishes and leftover food and clothes; and the children were dirty and in various stages of undress. A psychological evaluation was also presented as evidence, which stated that Dana had "significant cognitive deficits" that are "life-long in nature and will affect her future ability to problem solve and make decisions as a parent." A preliminary counseling report, which was also admitted into evidence, stated that Dana seemed to be overwhelmed with providing a nurturing and safe environment for the minors; that Dana failed to implement the weekly schedule that the therapist developed for the family on three separate occasions; that the therapist noticed moldy food in the kitchen and refrigerator, as well as a bag of raw meat in the children's bedroom; that the home lacked necessities such as toilet paper and soap; and that Dana provided only a limited amount of food for the children due to her poor financial planning. Case notes from the homemaker services, which were admitted as evidence at the hearing, stated that on August 21, 2012, every room in the home was dirty, the children were dirty, the bathtub water turned black when the children finally bathed, and the children all shared one towel. The homemaker's case notes also stated that, between September 1, 2012 and September 4, 2012, Dana did not clean the home despite the homemaker's instructions to do so, and that the kitchen was the filthiest it had ever been at the time the minors were taken into protective custody by DCFS.

¶ 38    Nonetheless, Dana makes several arguments in support of her position that the circuit court's findings were erroneous. She posits that, although she pled guilty to child endangerment in April 2012, it was "equally true that the minors were subsequently returned to [her] custody" because she was cooperating with DCFS and did not pose a risk to her children. We find this contention to be speculative and unpersuasive. The record is surprisingly silent as to why or when the children were returned to Dana's care given the overwhelming evidence supporting the decision to remove the children. Likewise, we reject Dana's assertion that the mess found in her home on September 4, 2012, could not have been that bad because the

homemaker was present in the home on that day and could have simply thrown out any spoiled food that may have posed a safety concern. This statement supports the contention that Dana lacks insight into her own shortcomings as a parent. Evidence was presented at the hearing that it was not the responsibility of the homemaker, but Dana's responsibility, to clean the home. Similarly, Dana contends that her sudden disappearance with her children from the home in August 2012 could not have been a proper factor in DCFS' decision to take protective custody of the minors on September 4, 2012, because DCFS had the opportunity to, but did not, immediately remove the minors during Armand's August 27, 2012 visit to the home. We reject this contention. Dana simply cherry picks and highlights evidence in the record that seem favorable to her, in an effort to overturn the circuit court's findings. However, as noted, our review on appeal is deferential, and we will not disturb the court's determinations unless the opposite conclusion is clearly evident from the record. Based on our review of the evidence, we find that, under the circumstances of this case, the circuit court's determination that Tamesha, Jacob, Emmanuel, Jeremiah, and Angel were neglected due to a lack of necessary care (705 ILCS 405/2-3(1)(a) (West 2012)), was not against the manifest weight of the evidence.

¶ 39    We further find that the evidence supports the circuit court's finding that all six of the minors were neglected due to an injurious environment.

¶ 40    Under section 2-3(1)(b) of the Act, minors under the age of 18 are neglected if their "environment is injurious to [their] welfare." 705 ILCS 405/2-3(1)(b) (West 2012). The term "injurious environment" has been recognized by our courts as "an amorphous concept that cannot be defined with particularity." *In re Arthur H.*, 212 Ill. 2d at 463; *In re N.B.*, 191 Ill. 2d 338, 346 (2000). In general, however, the term "injurious environment" has been interpreted to include "the breach of a parent's duty to ensure a 'safe and nurturing shelter' for his or her children." *In re N.B.*, 191 Ill. 2d at 346 (quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

¶ 41    Evidence presented at the adjudication hearing shows that, as discussed, in March 2012, Tamesha and Jacob were found to be minimally dressed outside of the home while Dana was purportedly at the laundromat. In March 2012, Dana's children were found naked and playing outside on a third-floor window ledge, while Dana was taking a bath with her youngest child. When investigators arrived at the home, they discovered butcher knives on the floor of the home, and the police thereafter arrested Dana, who pled guilty to child endangerment in April 2012. We find that these facts alone establish that the children were not provided with a "safe and nurturing shelter." Evidence was also presented that Dana kept a bag of raw meat in the children's bedroom, as well as moldy food in the kitchen, that a diaper with feces on it was found in one of the rooms, and that the home lacked basic toiletries and was generally unclean. According to the homemaker's case notes, on August 27, 2012, Angel's vagina was observed to be swollen, Angel informed the homemaker that someone had touched her inappropriately, and Emmanuel informed the homemaker that he did not want to stay with Dana because he was "afraid mommy Dana is going to get hurt by a man." The evidence also revealed that Dana needed domestic violence services, but that she had yet to participate in those services because she had not consistently cooperated with the parenting coaching services. Further, as discussed, evidence was presented at the hearing that Dana lacked progress or participation in the support services, as well as failed to implement the skills she learned from the parenting classes and the homemaker services at home. The psychological evaluation, which was admitted into evidence, detailed Dana's "significant cognitive deficits" that are "life-long in

- 14 -

nature and will affect her future ability to problem solve and make decisions as a parent," and stated that Dana seemed to be overwhelmed with providing a nurturing and safe environment for the minors. Based on our review of the record, we find that the evidence was sufficient to support the court's finding that the five oldest children–Tamesha, Jacob, Emmanuel, Jeremiah, and Angel–were neglected due to an environment that was injurious to their welfare. See *In re R.S.*, 382 Ill. App. 3d 453 (2008) (affirming the circuit court's finding of neglect based on an injurious environment, where mother had longstanding mental health issues, made minimal progress in therapy, and no testimony was presented that mother could care for minor); *In re John Paul J.*, 343 Ill. App. 3d 865 (2003) (affirming the circuit court's judgment that minor was neglected due to an injurious environment, where evidence showed mother had mental health issues, failed in the past to follow through with DCFS recommendations, and natural father failed to participate in substance abuse services).

¶ 42    We further find that the evidence supports the circuit court's finding that Malachi was a neglected minor due to an injurious environment. As discussed, the State filed a petition for adjudication for Malachi on October 30, 2012–one week after Malachi was born. Under the theory of anticipatory neglect, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child. *In re Arthur H.*, 212 Ill. 2d at 468. "Proof of neglect of one minor is admissible on the issue of the neglect of any other minor for whom the parent is responsible." *In re J.C.*, 396 Ill. App. 3d 1050, 1057 (2009) (citing 705 ILCS 405/2-18(3) (West 2008)). Although there is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same household, such neglect should be measured by the circumstances of the sibling as well as the care and condition of the child in question. *In re Arthur H.*, 212 Ill. 2d at 468. Nevertheless, our supreme court also recognizes that "when faced with evidence of prior neglect by parents, the juvenile court should not be forced to refrain from taking action until each particular child suffers an injury." (Internal quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d at 477.

¶ 43    Based on the evidence regarding the injurious environment in which Malachi's five siblings were living, as detailed above, we find that Malachi was certainly subject to the same injurious environment. Indeed, at the adjudication hearing, medical records from Saint Bernard Hospital, where Dana was involuntarily hospitalized for psychiatric evaluation in September 2012, revealed that she attempted suicide by ingesting 50 prenatal vitamins while she was 8 months pregnant with Malachi. Although it is unclear whether overdosing on prenatal vitamins could have actually harmed Dana or the fetus, this incident demonstrated Dana's mental instability and need for help, as well as the injurious environment in which she was willing to place Malachi. Thus, we find that the evidence supports the circuit court's finding, under an anticipatory neglect theory, that Malachi was a neglected minor due to an environment that was injurious to his welfare. See *In re J.C.*, 396 Ill. App. 3d at 1058-59 (affirming lower court's finding of anticipatory neglect of infant J.C., where J.C.'s seven older siblings had previously been found to be neglected, support services for the mother were ongoing, and therapist remained concerned about both parents' ability to parent). Therefore, we hold that the circuit court's finding that all six of Dana's children were neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2012)), was not against the manifest weight of the evidence.

¶ 44    Likewise, we find that the evidence supports the circuit court's finding that all six of the minors were abused due to a substantial risk of physical injury. Section 2-3(2)(ii) of the Act provides that a minor is abused when his parent "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2012). We find that the same facts and evidence which support a finding of neglect due to an injurious environment, also support the court's finding of abuse due to a substantial risk of physical injury. We need not recite yet again the mountain of evidence which we have detailed throughout our analysis. The record speaks for itself. See *In re Kenneth D.*, 364 Ill. App. 3d 797 (2006) (affirming the circuit court's findings of abuse due to a substantial risk of physical injury, and neglect due to an injurious environment, which were based on the same evidence); see also *In re R.G.*, 2012 IL App (1st) 120193, ¶ 46 (same evidence that supports the finding of abuse due to a substantial risk of physical injury, supports the finding that the State proved, by a preponderance of the evidence, that minor was neglected due to an injurious environment). Therefore, we hold that the circuit court's finding that all six minors were abused due to a substantial risk of physical injury, was not against the manifest weight of the evidence.

¶ 45    Further, we note that, although Dana's notice of appeal refers to the circuit court's August 12, 2013 "adjudication and disposition" orders, she makes no arguments on appeal with regard to the circuit court's disposition ruling that it was in the children's best interest to be adjudged wards of the court and to be placed in the guardianship of DCFS "with right to place the minor[s]." Indeed, footnote 1 of Dana's opening brief before this court clarifies that, at the disposition hearing, she "did not request return home of the minors to her custody" and requested that the court enter a finding that she was unable, not unwilling, to care for her children–a request which the circuit court granted. Footnote 1 further states that Dana "is not arguing in this appeal that the [circuit] court erred in making the minors wards of the court, and [in] finding her unable to train, protect, and care for the minors." Thus, because Dana does not challenge the court's disposition order on appeal, we need not address this issue further.

¶ 46    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 47    Affirmed.