2023 IL App (1st) 230843-U

THIRD DIVISION
October 18, 2023

No. 1-23-0843

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| IN THE INTEREST OF J.L. and E.W., | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Minors-Respondents-Appellees | ) | |
| | ) | |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 20 JA 2014 & 2015 |
| | ) | |
| JENNIFER B., | ) | Honorable |
| | ) | Demetrios Kottaras, |
| Mother-Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE R. VAN TINE delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the circuit court's findings, following an adjudication hearing, that the minors were abused and neglected over the mother's challenges to the sufficiency of the evidence.

¶ 2    At an adjudication hearing, the circuit court found that Jennifer B. abused and neglected her two minor children, J.L. and E.W. At the disposition hearing, the court found that Jennifer was unable to care for the children, and adjudged them wards of the court. On appeal, Jennifer challenges the sufficiency of the evidence regarding the court's findings of abuse and neglect. She does not challenge the disposition order. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4    Jennifer is the biological mother of J.L., born on October 24, 2017, and E.W., born on May 20, 2020. E.W. had a twin sister, K.W., who was found dead at three months old on the morning of August 24, 2020, while under the care of Jennifer, with whom she co-slept. Vomit was found around K.W.'s mouth, and the medical examiner could not rule out asphyxiation as K.W.'s cause of death. That same day, J.L. and E.W. entered into protective custody.

¶ 5    On August 26, 2020, the State filed petitions for adjudications of wardship for J.L. and E.W. J.L.'s petition alleged that he was neglected based on an environment injurious to his welfare, abused based on physical abuse, and abused based on substantial risk of physical injury. The factual allegations in support of the petition alleged as follows:

"Natural mother has three prior indicated reports for inadequate supervision, inadequate shelter and substantial risk of physical injury/environment injurious. Putative father has one prior indicated report for substantial risk of physical injury/environment injurious. On or about March 17, 2020, putative father pulled this minor off of a bicycle and slammed him onto a floor. Natural mother has a history of multiple past psychiatric hospitalizations and a long standing diagnosis of bipolar disorder with medication non-compliance. Natural mother and putative father have a history of domestic violence. Natural mother has been non-compliant with DCFS attempts to engage her in mental health treatment. This minor's sibling's putative

father reports that he and natural mother argue daily and that she is physically violent towards him. Natural mother reports not being able to control her anger and that, when this minor and this minor's sibling cry, she 'ties them down.' This minor's other infant sibling was found deceased on or about August 24, 2020 after co-sleeping with natural mother. Putative father is currently incarcerated. Paternity has not been established."

¶ 6    E.W.'s petition alleged that he was neglected based on an environment injurious to his welfare, and abused based on substantial risk of physical injury. The factual allegations in support of his petition alleged as follows:

"Natural mother has three prior indicated reports for inadequate supervision, inadequate shelter and substantial risk of physical injury/environment injurious. Natural mother has a history of multiple past psychiatric hospitalizations and a long standing diagnosis of bipolar disorder with medication non-compliance. Natural mother and this minor's sibling's putative father have a history of domestic violence. Natural mother has been non-compliant with DCFS attempts to engage her in mental health treatment. This minor's putative father reports that he and natural mother argue daily and that she is physically violent towards him. Natural mother reports not being able to control her anger and that, when this minor and this minor's sibling cry, she 'ties them down.' This minor's other infant sibling was found deceased on or about August 24, 2020 after co-sleeping with natural mother. Paternity has not been established."

¶ 7    That same day, the circuit court granted the State's motions for temporary custody for both minors.

¶ 8    On December 6, 2022 and January 24, 2023, the circuit court held adjudicatory hearings on these petitions. The State called three witnesses: Adrienne Hudson, a Department of Children

& Family Services (DCFS) intact worker; Nathalie Castro, a DCFS child protection specialist; and Halema Townsend, a DCFS child protection investigator.

¶ 9    Hudson testified that she was assigned to the family in July 2020 after Jennifer gave birth to the twins. Hudson understood that Jennifer was referred due to the risk Jennifer posed to the twins, as she had a history of mental illness and habitual marijuana use. Hudson met with Jennifer at her home on July 7, 2020, and recommended parenting classes, a mental health assessment, daycare services for the kids, and a zero-to-three evaluation for the twins. A couple days later, Hudson returned to Jennifer's home with two portable cribs with bassinet attachments. She explained to Jennifer that she could not co-sleep with the twins and that both portable cribs had to remain in the bedroom with her. Jennifer agreed to this arrangement.

¶ 10    On August 11, 2020, Hudson met again with Jennifer at her home. Hudson testified that Jennifer explained to her that she and her paramour had recently broken up due to an argument they had regarding Jennifer's disciplining of J.L. According to Hudson, Jennifer informed her that she had hit J.L. but Hudson could not remember whether Jennifer indicated where she had hit J.L., or in what manner. Hudson cautioned Jennifer against using corporal punishment, and said she would arrange a referral for parenting classes.

¶ 11    The State called Castro next. Castro testified that she was the child protection specialist whom DCFS assigned to Jennifer after the death of K.W. Castro spoke with Jennifer over the phone to implement a safety plan for the children. This included medical assessments for the other children in Jennifer's home (J.L. and E.W.). As part of the plan, Jennifer was permitted only supervised contact with the minors. According to Castro, the implementation of a safety plan is part of DCFS's routine whenever there is the death of a child in a home, and there are other

surviving children in the home. The goal of the plan is to ensure that the surviving children do not have marks, bruises, or other signs of abuse or neglect. Jennifer agreed to the plan.

¶ 12    The State's final witness, Townsend, testified that she took J.L. and E.W. into protective custody on August 24, 2020, just hours after K.W.'s death. At that time, Townsend was a child protection investigator assigned to determine whether K.W.'s death was the result of neglect. That same day, Townsend had an in-person conversation with Jennifer. Jennifer had three prior indicated reports for substantial risk of physical injury, injurious environment, inadequate supervision, and inadequate shelter. According to Townsend, Jennifer told her that K.W. was acting "fussy" prior to Jennifer putting her down to sleep in an adult bed with her. Jennifer indicated she smoked marijuana three times a day to stimulate her appetite and control her anger issues, and that she had smoked marijuana prior to going to sleep that night with K.W. Townsend further averred that Jennifer self-reported her diagnoses of bipolar disorder, PTSD, ADHD, and anxiety. Jennifer denied being on any psychotropic medications at that time.

¶ 13    Townsend testified that she had another in-person conversation with Jennifer on August 26, 2020. Jennifer told Townsend that when she was struggling with anger management issues and the kids cried excessively, she would "tie them down." Jennifer did not explain what she meant by "tie them down." Townsend also explained that the reason she took custody of the two minors on August 24 was because there were a "lot of risks that could not be mitigated." These included Jennifer's own admission that she was abusing illegal drugs at that time, and that she needed them to function daily. Townsend stated that Jennifer displayed a "blatant disregard" regarding safe sleep practices that were discussed with her previously. According to Townsend, Jennifer self-reported that, although her relationship with her paramour was not physically violent, the police had been called to the house on multiple occasions for domestic disputes.

¶ 14    The State also introduced two exhibits into evidence. The first exhibit consisted of K.W.'s medical records. These detailed the night that K.W. died. In summary, the records show the following. Jennifer fed K.W. shortly after midnight on August 24, 2020, and put her to sleep between her legs and the wall adjacent to the bed. Jennifer woke up later that night, and noticed that K.W. was not breathing and had vomit around her mouth. She called 911. The police arrived and administered CPR because K.W. was pulseless. At 3:34 a.m. on August 24, 2020, K.W. arrived in the emergency room in full cardiac arrest.  She was pronounced dead at 3:59 a.m. K.W.'s birth records, contained with the first exhibit, showed that she was first given to her maternal aunt. The records also reflected that Jennifer had psychiatric problems, including "maternal bipolar disorder", as well as a history of cigarette and marijuana use during pregnancy.

¶ 15    The State's second exhibit included the medical examiner's postmortem examination of K.W. The medical examiner found K.W. to be well-developed and well-nourished. The medical examiner could not determine the cause of death. However, he could not exclude asphyxiation as the cause of death because it does not leave anatomic findings, and Jennifer had a history of keeping K.W. in an unsafe sleeping environment.

¶ 16    Jennifer testified on her own behalf. She explained that she had a plan with her sister for the sister to care for the twins after they were born because she "knew DCFS would come in" as a result of her testing positive for marijuana at that time. She stated that she did, however, plan to raise them with the help of DCFS. After a short time under the care of Jennifer's sister and father, Jennifer took physical custody. By the time of K.W.'s death, the twins and J.L. had been with Jennifer for a couple of months.

¶ 17    Jennifer's version of events of the night of K.W.'s death are as follows. She put the twins down to sleep. As K.W. was drifting to sleep, E.W. started crying. When she checked on E.W.,

she observed that his "facial expression wasn't normal." She then turned to K.W. to notice that her facial expression also was not normal, and she was unresponsive. Jennifer ran out of the house and told her cousin to call the police. Jennifer fell on the ground with K.W. in her arms as the police began to arrive.

¶ 18     Jennifer testified that she never hit J.L. – rather, she would only "tap" him on his hand or his butt. She would also have him stand in the corner for timeouts. Concerning the allegations that she tied the twins down, she stated that she would use the straps of the rocker to tie them down in the rocker itself. During cross-examination, however, Jennifer acknowledged that she did not tell Townsend that she tied the twins down in the rocker – only that she had tied them down. She also did not specify that it was only the twins she tied down, but rather "them" in general. She stated that when she was upset or frustrated, "of course [she] will have to put them down." Jennifer also admitted to smoking marijuana three to four times a day during her pregnancy with the twins.

¶ 19     On April 17, 2023, the circuit court entered adjudication orders. As to J.L., the court found that he was neglected based on being in an injurious environment. It also found that he was abused based both on a substantial risk of injury and excessive corporal punishment. As to E.W., the court found that he was neglected based on being in an injurious environment, and abused based on a substantial risk of physical injury. The court also entered disposition orders finding that Jennifer was unable to care for both minors, and adjudged them wards of the court, granting a DCFS guardianship administrator the right to place the minors. This appeal of the adjudication orders follows.

¶ 20                                    ANALYSIS

¶ 21     On appeal, Jennifer challenges the circuit court's findings that she abused and neglected J.L. and E.W., arguing that the court incorrectly interpreted the evidence that the State adduced in

support of its claims. She does not challenge the circuit court's dispositional finding that she was unable to care for her children.

¶ 22    The Juvenile Court Act of 1987 (the Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) establishes the procedures and criteria for determining whether to remove a minor from his parent's custody and whether to make that minor a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). This determination involves a two-step process. *In re A.P.*, 2012 IL 113875, ¶ 18. First, the court holds an adjudicatory hearing to determine whether the minor is abused, neglected, or dependent. *Id.* ¶ 19; 705 ILCS 405/2-21(1) (West 2022). If the court determines that the minor is abused, neglected, or dependent, it holds a dispositional hearing to determine whether it is in the best interest of the minor and the public for the minor to become a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 21; 705 ILCS 405/2-21(2) (West 2022). Here, we consider only the adjudicatory findings complained of, as Jennifer does not challenge the disposition order.

¶ 23    "A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). The State must prove its allegations of neglect and abuse by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. In other words, the State must prove that the allegations of neglect and abuse are more probably true than not. *Id.* " 'A reviewing court will reverse the juvenile court's determination 'only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order.' " *In re A.S.*, 2020 IL App (1st) 200560, ¶ 22 (quoting *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006)). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d 441, 464. "Because a trial court is in a superior position to assess the credibility of

witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision." *In re April C.* 326 Ill. App. 3d 245, 257 (2001) (citing *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998)). "Ultimately, there is a 'strong and compelling presumption in favor of the result reached by the trial court' in child custody cases." *In re William H.*, 407 Ill. App. 3d 858, 866 (2011) (quoting *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 324 (2005)). In turn, we address the court's findings of neglect and abuse.

¶ 24                                    *Neglect Findings*

¶ 25     We begin with Jennifer's challenge to the circuit court's findings that she neglected J.L. and E.W. "Neglect" is the "failure to exercise the care that circumstances justly demand and includes both willful and unintentional disregard of parental duties." *In re Christopher S.*, 364 Ill. App. 3d 76, 88 (2006). However, the term does not contain a "fixed and measured" meaning, so it takes its content from the specific circumstances of each case. *Id.* Therefore, cases involving adjudication of neglect are *sui generis*, and each case must be decided on the basis of its own unique circumstances. *Id.* Additionally, Illinois law defines a neglected minor as any person under the age of 18 whose environment is injurious to his or her welfare. 705 ILCS 405/2-3(1)(b) (West 2022). Our courts recognize that "injurious environment" is "an amorphous concept that cannot be defined with particularity, but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for h[er] children." *In re Kamisha J.*, 364 Ill. App. 3d 785, 793 (2006). Finally, and importantly, the State need not, and indeed should not, wait for an injury to occur when there are other indicia, such as a parent's history of neglect or abuse, before stepping in to protect a child at risk. *In re Arthur H.*, 212 Ill. 2d at 468.

¶ 26    Here, the State produced evidence to show that Jennifer smoked marijuana multiple times per day during her pregnancy with E.W., and continued to do so while E.W. and J.L. were under her care. She claimed that she smoked marijuana to manage her anger. On multiple occasions, the police were called to her home pursuant to reports of domestic violence between Jennifer and her paramour. One of their arguments stemmed from his disagreement with how Jennifer disciplined J.L. Moreover, although DCFS provided Jennifer with cribs for the twins and warned her that she must not co-sleep with them, she nonetheless co-slept with the twins. One of the twins died in her care after she co-slept with her. Despite her self-reported history of anger management issues, anxiety, bipolar disorder, ADHD, and PTSD, she avoided attending a mental health assessment and parenting classes. Jennifer did not rebut any of this evidence.

¶ 27    Based on the foregoing, we agree that Jennifer breached her duty to ensure a safe and nurturing shelter for J.L. and E.W., thereby placing them in an injurious environment. Accordingly, we cannot find that the circuit court's findings were against the manifest weight of the evidence.

¶ 28                                        *Abuse Findings*

¶ 29    We turn now to Jennifer's contention that the circuit court erred in finding that she abused J.L. and E.W. Under section 2-3(2)(ii) of the Act, an abused minor includes a child whose parent or other person responsible for his welfare "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2022). The same facts that support a court's finding of neglect due to an injurious environment can also support a finding of abuse due to a substantial risk of injury. *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 44. We find that they do so in this case.

¶ 30    In addition to the evidence we recited above in our finding that Jennifer neglected J.L. and E.W., which alone can support also a finding of abuse, we note here the ways in which Jennifer's physical actions created a substantial risk of injury. With respect to J.L., Jennifer testified that she had lightly hit J.L. This testimony was inconsistent with Hudson's, in which Hudson stated that her conversation with Jennifer revealed Jennifer and her paramour had an argument over Jennifer's disciplining of J.L. It is not an abuse of discretion for the circuit court judge to infer that this meant physical discipline, as Hudson then cautioned Jennifer against corporal punishment, and stated she would provide Jennifer with a referral to parenting classes. It is the role of the circuit court to conduct credibility findings: "[t]he trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses and, therefore, it is in the best position to determine the credibility and weight of the witnesses' testimony." *In re E.S.,* 324 Ill. App. 3d 661, 667 (2001). As a result, "the trial court is afforded broad discretion when determining the existence of abuse. *In re R.M.,* 307 Ill. App. 3d 541, 551 (1999). Here, the circuit court conducted a hearing in which it had the opportunity to listen to all witness testimony and examine exhibits. Upon doing so, it found that the State proved, by a preponderance of the evidence, that J.L. was abused physically. As there is nothing to suggest here that the circuit court's determination was against the manifest weight of the evidence, we affirm its finding.

¶ 31    Finally, it is clear from the evidence that Jennifer admitted that she would "tie" her children "down" when she was angry. We note here Jennifer's word choice: she stated that she would "tie" the children "down". One would expect a different word choice—such as "buckle"—a common word that refers to a normal restraint used to secure children for their safety in cars and other portable carriages. It is also worth noting that Jennifer explained she would tie the children after she became angry, upset, or frustrated. Her motive for the restraint—anger—is entirely

distinguishable from the motive a parent who buckles a seatbelt on a child would have: safety. Tying down babies and a two-year old can certainly also impair emotional health. We defer to the circuit court in its findings after weighing both sides' evidence.

¶ 32    In sum, we cannot find that the circuit court's abuse findings were against the manifest weight of the evidence.

¶ 33                    *Excessive Corporal Punishment Finding*

¶ 34    As to J.L. only, the circuit court also found that Jennifer employed excessive corporal punishment. The circuit court's determination that punishing a two-year old by forcing him to stand in a corner and tying him down is excessive given the child's age is not against the manifest weight of the evidence. However, because we already found that Jennifer created a substantial risk of physical injury, we need not address excessive corporal punishment. That is, since excessive corporal punishment is just one example of abuse listed under section 2-3(2) of the Act (705 ILCS 405/2-3(2) (West 2022)), and we already found that Jennifer fulfilled another enumerated example of abuse under section 2-3(2) by creating a substantial risk of physical injury under section 2-3(2)(ii), we need not address corporal punishment. In other words, we have found that Jennifer neglected and abused J.L. regardless of whether she excessively corporally punished him because J.L. was in an injurious environment and also exposed to a substantial risk of physical injury.

¶ 35                            CONCLUSION

¶ 36    For these reasons, we affirm the circuit court's adjudicatory findings that Jennifer abused and neglected both J.L. and E.W.

¶ 37    Affirmed.