2019 IL App (1st) 181414-U

THIRD DIVISION
December 26, 2019

No. 1-18-1414

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* M.L.W-B. and L.W., Minors, | ) | Appeal from the |
| | ) | Circuit Court of |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 12 JA 00921 |
| v. | ) | 12 JA 00922 |
| | ) | |
| B.W., | ) | Honorable |
| | ) | Patrick Murphy, |
| Respondent-Appellant.) | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Ellis and Justice Cobbs concurred in the judgment.

ORDER

¶ 1     *Held*:   The judgment of the circuit court of Cook County finding respondent unfit is affirmed, the trial court's finding respondent unfit under section 1(D) of the Illinois Adoption Act was not against the manifest weight of the evidence and the trial court made its ruling based on evidence presented before it and did not apply the law-of-the-case doctrine; the trial court did not err by questioning a witness; or admitting certain exhibits and testimony into evidence.

¶ 2     Respondent, B.W., appeals the trial court's finding her unfit to parent her two biological daughters, M.L.W-B. and L.W., pursuant to grounds 1(D)(b) and (m) of the Illinois Adoption Act (Adoption Act).

¶ 3     On September 13, 2012, the Department of Children and Family Services (DCFS) took respondent's three children M.L.W-B., L.W., and A.W. into protective custody after receiving a report alleging abuse and neglect.  The DCFS investigator discovered M.L.W-B, then age two, and L.W., age one, unsupervised in an unlocked room of the shelter where the children were living with respondent.  L.W. was found with a sewing needle in her mouth.

¶ 4     On September 18, 2012, the State commenced this juvenile proceeding with the filing of temporary custody motions and petitions to adjudicate wardship of M.L.W-B. and L.W.  On May 20, 2014, the trial court entered adjudication orders based on stipulations finding the children abused or neglected due to lack of care, an injurious environment, and substantial risk/physical injury.  On April 27, 2017, the State filed a supplemental pleading with respect to M.L.W-B. and L.W. seeking termination of respondent's parental rights and the appointment of a guardian with the right to consent to adoption alleging that respondent was unfit.

¶ 5     On May 2, 2018, a three-day trial commenced on the State's petition seeking termination of respondent's parental rights. The trial consisted of two separate hearings – the first hearing concerned the fitness of respondent to parent M.L.W-B. and L.W. (unfitness hearing) and the second concerned the children's best interests with respect to termination of respondent's parental rights (best-interest hearing).  The trial court found respondent unfit at the conclusion of the first hearing and subsequently determined it was in the children's best interest to terminate respondent's parental rights as to M.L.W-B. and L.W.

¶ 6     Respondent timely filed her appeal alleging error only as to the trial court's unfitness determination.  Specifically, respondent argues the trial court (1) improperly applied "law-of-the-case doctrine" and thus failed to fully consider all the evidence; (2) improperly admitted out-of-court statements about respondent telling her daughter about a kidnapping plot; (3) erred in

eliciting testimony from caseworker Adams; (4) erred in admitting State's exhibit 33 consisting of L.W.'s therapy reports; and (5) made findings that respondent was an unfit parent which were against the manifest weight of the evidence. We address respondent's arguments as well as her position that the prejudice to respondent was exacerbated by the cumulative impact of the alleged errors. For the reasons set forth below, we affirm the trial court's judgment finding respondent unfit.

¶ 7                                     BACKGROUND

¶ 8                         General Background and Procedural History

Respondent, B.W., born November 20, 1985, is the biological mother of four children: three daughters, M.L.W-B., born July 2010; L.W., born September 2011; and D.W., born November 2013, and a son, A.R., born May 2006.[1] Each child's respective father's parental rights were also terminated on May 31, 2018 and none of those individuals are involved in this appeal. M.L.W-B. and L.W.'s siblings, A.R. and D.W., are not involved in this appeal because their cases were resolved with guardianship agreements between the children's foster parents and their biological parents which did not require the termination of respondent's parental rights.

---

[1] L.W., A.R., and D.W. all have different biological fathers and M.L.W-B.'s biological father is unknown. L.B's biological father, LA.B., filed a notice of appeal on June 11, 2018 seeking review of the trial court's May 31, 2018 judgment terminating his parental rights to L.W., appeal number 1-18-1402, which was consolidated with this appeal until November 1, 2018 after LA.B.'s counsel filed a motion for leave to withdraw as LA.B.'s appellate counsel citing *Anders v. California*, 386 U.S. 738 (1967). This court entered a summary order on December 19, 2018 granting the *Anders* motion and affirming the trial court's May 31, 2018 judgment. LA.B. is not involved in this appeal.

¶ 9    This juvenile case began on September 18, 2012, when the State filed temporary custody motions and petitions to adjudicate wardship of M.L.W-B and L.W. alleging both children were neglected based on an environment injurious to their welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Act) , 705 ILCS 405/2-3(1)(b) (West 2012); abused based on lack of necessary care pursuant to section 2-3(1)(a), 705 ILCS 405/2-3(1)(a) (West 2012); and at substantial risk of physical injury pursuant to section 2-3(2)(ii), 705 ILCS 405/2-3(2)(ii) (West 2012).  The case was assigned to Cook County Circuit Court Judge Kottaras and, that same day, he granted the temporary custody motion placing M.L.W-B., L.W. and A.R. in DCFS custody with the right to place the minor children.  Judge Kottaras presided over this matter through the middle of 2017 when the case was assigned to Judge Murphy who presided over this case through its conclusion.

¶ 10    On May 20, 2014, the trial court entered adjudication orders finding the children abused or neglected due to lack of care, an injurious environment, and substantial risk/physical injury. These findings were based on written stipulations attached to the adjudication order.

¶ 11    Pursuant to the parties' stipulations, on September 13, 2012, DCFS took M.L.W-B., L.W., and A.W. into protective custody after receiving a report alleging abuse and neglect.  The DCFS investigator discovered M.L.W-B., age two; L.W., age one; and A.R., age six, alone and unsupervised in an unlocked room of the shelter where the children were living with respondent. L.W. was found with a sewing needle in her mouth.  The room, deemed uninhabitable for the children, was cluttered, filthy, with cracks in the walls, and dirty sheets.  During the course of the investigation, the children continually presented as unbathed, with dirty clothes.  The investigator learned that respondent had multiple prior indicated reports against her for neglect and inadequate supervision beginning in 2010.  There was also an open investigation of

respondent and LA.B. for ligature marks found around A.R.'s neck. Respondent was ultimately indicated for substantial risk of physical injury and environment injurious and LA.B. was indicated for cuts, welts, and bruises related to A.R.'s ligature marks. Respondent reported to the DCFS caseworker on July 31, 2012 that she was diagnosed with depression and Post Traumatic Stress Disorder (PTSD) but had not been in services for several years. Since September 14, 2012 M.L.W-B., L.W., and A.R. had been in protective custody because respondent had not completed her substance abuse or mental health assessment. D.W., respondent's fourth child, was also placed in DCFS custody shortly after her birth in November 2013.

¶ 12    On November 18, 2014, after a dispositional hearing, the trial court entered orders finding that reasonable efforts had been made to prevent or eliminate the need for removal of the minors and that appropriate services aimed at family preservation and reunification had been unsuccessful. Respondent was found unable to "care for, protect, train or discipline the minor" for reasons other than financial circumstances alone and M.L.W-B., L.W., and their two siblings were adjudicated wards of the court and placed under DCFS guardianship.

¶ 13    On November 24, 2014, following a permanency hearing, the trial court ordered a goal of return home within 12 months and found that respondent had not made substantial progress toward the return home of the children. The order further found the services contained in the service plan were "appropriate and reasonably calculated to facilitate achievement of the permanency goal[;]" that services had been provided, but remained ongoing; and that DCFS had "made reasonable efforts in providing services to facilitate achievement of the permanency goal."

¶ 14    On August 24, 2016, a second permanency hearing was held wherein the permanency goal was changed from return home to substitute care pending court's determination of termination of parental rights finding that respondent had not made substantial progress toward

reunification. Again, the trial court found the services contained in the service plan were "appropriate and reasonably calculated to facilitate achievement of the permanency goal[;]" that services had been provided, but remained ongoing; and that DCFS had "made reasonable efforts in providing services to facilitate achievement of the permanency goal."

¶ 15    On April 27, 2017, the State filed a supplemental pleading with respect to M.L.W-B. and L.W. seeking termination of respondent's parental rights and the appointment of a guardian with the right to consent to adoption. The State alleged respondent was unfit as defined by section 50/1(D) of the Adoption Act, 750 ILCS 50/1 *et seq.* (West 2016), alleging under subsection (b) that respondent "failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" (Ground B) and subsection (m) that respondent "failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from [her] and/or [has] failed to make reasonable progress toward the return of the child to them within 9 months after the adjudication of neglect or abuse under the Juvenile Court Act, and/or within any 9 month period after said finding in violation of 705 ILCS 50/1(D)(m) [(Ground M)] and 750 ILCS 405/2-29." The State also alleged that it was in the best interest of M.L.W-B. and L.W. that respondent's parental rights be terminated and they be adopted by their foster parents who had physical custody of the girls since October 5, 2012 and wished to adopt them. Thereafter, the State filed a subsequent pleading setting forth the nine month period under Ground M from May 20, 2014 to February 20, 2015; and/or February 21, 2015 to November 21, 2015; and or November 22, 2015 to August 22, 2016; August 24, 2016 to May 24, 2017; and May 25, 2017 to February 25, 2018.

¶ 16    On July 6, 2017, respondent filed a motion to compel supervised visitation. In that motion, respondent alleged that she had no visitation with the girls since August 2016 despite

requests for time commencing in December 2016. The trial court entered an order providing for at least two supervised visits between respondent and the girls prior to September 14, 2017.

¶ 17  On November 6, 2017, a permanency order was entered finding, over respondent's objection, DCFS "made reasonable efforts in providing services to facilitate achievement of the permanency goal."

¶ 18  On December 14, 2017, respondent's visitation was "suspended [at] this time due to negative emotional impact on children[.]"  This case proceeded to hearing on the termination of respondent's parental rights over M.L.W-B. and L.W.  Two separate hearings were conducted - the first hearing being the unfitness hearing and the second being the best-interest hearing.

¶ 19                              Unfitness Hearing

¶ 20  The unfitness hearing commenced on May 2, 2018.  Evidence included testimony from caseworkers Georgette Adams and Georgia Alcazar; respondent's therapist, Kolleen Blume; and respondent.  The trial court took judicial notice of pleadings and orders to include permanency orders entered on November 24, 2014 and August 24, 2016 finding lack of progress, the order entered December 14, 2017 suspending respondent's supervised visits due to the negative emotional impact on the children, and respondent's July 6, 2017 motion to compel visitation and the July 14, 2017 court order providing for two supervised visits prior to September 2017.

¶ 21                    Caseworker Georgette Adams' Testimony

¶ 22  Caseworker Georgette Adams testified that she was a DCFS caseworker assigned to this case from September 2012 until January 2017 when the case was assigned to a private agency.

¶ 23  Respondent required therapy which she began on a weekly basis.  Despite being involved in therapy from 2013 to 2016, respondent did not make good progress or achieve her therapeutic goals.  At respondent's therapist's recommendation, respondent participated in a psychological

evaluation in July 2016 which was entered into evidence. Respondent was diagnosed with Major Depressive Disorder with dependency traits.

¶ 24    Throughout Adams' involvement with respondent, she did not have stable housing and moved to various houses and hotels which were never suitable for the children. Adams provided her a CHA housing pamphlet on one occasion but did not make any housing referrals because respondent always had somewhere to stay and return home of M.L.W-B. and L.W. was not imminent and such referrals are only made if the case is close to a return home. Respondent completed two rounds of parenting classes. In 2016, respondent's therapist recommended parent coaching; however, respondent did not complete the program. Respondent wanted to reunify with M.L.W-B. and L.W. and things began looking up for her when she became employed for four to five months, however, respondent digressed when she lost her job.

¶ 25    During Adams' tenure as caseworker, respondent was allowed weekly supervised visits with M.L.W-B. and L.W. Respondent never progressed to unsupervised visits with her daughters because respondent's therapist never recommended it believing the children would not be safe alone with respondent. These visits were supervised by Passages and Adams observed visits approximately once every other month. During her observations, she noted respondent would talk to the Passages personnel rather than interacting with the girls. Respondent would sit a lot during the visits and was physically unable to interact with the children.

¶ 26    Adams testified respondent's vitiation was suspended in August 2016 after M.L.W-B. reported respondent told her she was going to kidnap M.L.W-B. which respondent indicated was stated in front of the supervisors who denied hearing respondent make that statement.

¶ 27    Adams testified as to respondent disliking the girls calling her foster parents "mom and dad" and referring to respondent as "visit mom" which was reported by the girls during Adams' conversations with them.

¶ 28                    Caseworker Georgia Alcazar's Trial Testimony

¶ 29    Caseworker Georgia Alcazar testified she had been assigned to this case since August 2017.  At the time the girls were in specialized foster care.  M.L.W-B. had developmental delays and L.W. had behavioral issues.  Alcazar observed a visit on October 6, 2017.  During that visit respondent had inappropriate discussions in front of M.L.W-B. and L.W. about how the case was going, her opinions on it, and blamed the foster parents for various incidents.  Respondent also talked about her boyfriend in front of the girls.  Alcazar had to reiterate to respondent that she should not discuss these things in front of M.L.W-B. and L.W.

¶ 30    Alcazar attempted to schedule a second visit in October 2017 but it did not occur because respondent did not have transportation from Indiana.  Respondent did not ask about M.L.W-B. or L.W. during this communication.  Visits did not occur in November and December again due to respondent's lack of transportation from Indiana.  When Alcazar communicated with respondent regarding canceling her December visit, respondent did not inquire about M.L.W-B. or L.W. Since December 2017, respondent had not had any visits with M.L.W-B. or L.W., respondent had not contacted Alcazar to ask about the girls, and she had not sent any cards, gifts, or letters to the girls.

¶ 31                    Kolleen Blume's Trial Testimony

¶ 32    Kolleen Blume testified she was a clinical therapist who administered individual therapy to respondent from January 2013 until May 2017.  DCFS had referred respondent to therapy to address decision-making skills in relationships, protecting her family, anger management,

domestic violence, loss and separation from her children, and coping skills. Every three months, Blume wrote a therapy report regarding respondent's progress and those reports were entered into evidence.

¶ 33    Blume's therapy reports noted respondent's lack of self-care, that she often showed up to appointments dirty, with foul body order. The reports noted that respondent's therapy sessions lacked consistency, with several sessions being missed. The reports also indicated that respondent did not attend parent-child visits consistently. Blume recommended that respondent maintain weekly visits with her children and when she was unable to visit that she call them or write letters to them.

¶ 34    The reports discussed respondent's social history and that she had been in at least four extremely abusive relationships. The April 2013 report noted that respondent attended therapy regularly but her pattern of abusive relationships and lack of change and insight concerning her romantic partners put the children at risk in her physical care. The July 2013 report stated that respondent had become pregnant with a fourth child and the father was L.S. who she had an on and off relationship with, but who respondent called abusive.

¶ 35    Blume observed one of respondent's visits with M.L.W-B. and L.W. which was discussed in Blume's October 2014 report. Blume noted that respondent needed to exhibit a willingness to engage her children in activities stating respondent "is unable to take initiative and actively engage them in an activity or plan for the visit." When Blume addressed respondent's lack of engagement with her children, respondent stated she "will do things with them when they return home."

¶ 36    In the July 2015 therapy report, respondent reported to Blume that L.S., who respondent indicated she planned to marry, could not get a job due to his felony history and earned a living

by panhandling. L.S. rarely visited their daughter, D.W. and did not help care for her. Respondent stated that when the children returned home, L.S. would provide childcare. Blume wrote that respondent was not realistic about L.S.'s ability to care for four children and respondent did not understand the "magnitude of responsibility she would have caring for four children." The report stated respondent's continued choice of unhealthy partners "may put her children at risk of harm." The report noted respondent needed to show she could organize and engage in healthy activities with her children and discipline them without force or loud tones.

¶ 37    The July 2016 report observed that respondent was "living the lifestyle similar to when she first began individual therapy sessions" and Blume did not recommend returning the children home.

¶ 38                          Respondent's Trial Testimony

¶ 39    Respondent testified that she had moved over a dozen times during the case within Indiana and Illinois. She reached out to the agency and her therapist for assistance in finding more stable housing but was not given help.

¶ 40    M.L.W-B. and L.W. were residing in Bourbonnais, Illinois and respondent would travel there weekly for two-hour visits. The visits were at McDonalds playland and all M.L.W-B. and L.W. wanted to do was run and play. Respondent asked that the visits be moved closer to respondent and to a different location. Respondent wanted the visits "to be somewhere active" such as "the zoo or a park instead of sitting down and eating with them." The agency did not change the location of the visits.

¶ 41    Respondent was in email contact with M.L.W-B. and L.W.'s foster parents but they only corresponded regarding events like a birthday or a medical concern. Respondent did not email

the foster mother to ask about M.L.W-B. or L.W. because she did not feel like she would get a straight answer. Respondent emailed her daughters happy birthday and Merry Christmas.

¶ 42    Respondent testified she stopped visiting M.L.W-B. and L.W. in September or October 2017 because she moved to Gary, Indiana in September 2017. After Adams left the agency respondent was confused about who her caseworker was, but believed she learned it was Alcazar through A.R.'s foster parent. Respondent contacted caseworker Alcazar approximately one week after she returned to Chicago, but never received any communication about scheduling visits. Respondent did not visit the girls from August 2016 to September 2017 because one of the girls told the foster mother that respondent planned to kidnap her. Respondent denied making such statements.

¶ 43    Respondent participated in parenting classes, domestic violence therapy, consistently participated in individual therapy for over four years, and took parent coaching. Respondent testified she always visited her daughters. A report from a parent training group was introduced into evidence noting respondent's successful completion of the course and outstanding performance on the final.

¶ 44                          Relevant Exhibits

¶ 45    Various service plans and court reports evidencing unsatisfactory progress by respondent with respect to her visitation with the children were moved into evidence. An August 2016 Permanency Planning Hearing Report to the Court (court report) stated that "[d]uring visits [respondent] had been observed being inappropriate, screaming at the children and she is not very active with her children during visits." In an October 2015 court report caseworker Adams wrote that respondent had made inappropriate promises to the children during visits and that Adams had to redirect respondent to watch her children.

¶ 46    The State sought to move exhibit 33 into evidence.  Exhibit 33 consisted of L.W.'s certified and delegated therapy reports from the Helen Wheeler Center which included "a July 17, 2017 mental health assessment, an individual treatment plan from January 22, 2018, and progress notes from July of 2016 to May of 2018 [which were] also certified and delegated."

¶ 47    Respondent's counsel objected to exhibit 33 stating "I don't see how that goes to the issue of fitness for the parents.  ***  I don't think it's relevant."  The State argued the documents were introduced because "there was some indication *** through testimony about [L.W.'s] reaction after visits with the mother, and these documents as relates to the progress notes reflect some of that concern by the therapist."  The trial court responded "Well, I will admit it for what they are worth."

¶ 48                                Oral Unfitness Ruling

¶ 49    Following closing argument, the trial court noted that it had reviewed the documentation and listened to the witnesses finding the caseworkers "very credible, believable, [and] hardworking."  The court noted the parents expressed concern and did certain things, but "for one reason or another never really did what had to be done."  The court noted that respondent kept moving around and was, at the time of trial unemployed and living in a room.  The court also discussed respondent's health issues which had not been sufficiently dealt with and impeded her ability to be available to her children, meet their needs, and "effectively care for her three active daughters despite the services she engaged in."  The court further stated:

> "It is not fair to *** put the children's lives on hold when it has *** been very
> clear that the parents may be willing but not able or capable of being full-time
> parents of these children."

¶ 50    The court concluded:

"by clear and convincing evidence that five years and eight months is enough. It's time to move on. We're not punishing the parents, but if we don't move on we certainly are punishing the children.

So I'm making findings with respect to B, parents failure to maintain reasonable degree of interest, concern, or responsibility. And M, failed to make reasonable efforts particularly over many nine-month periods of time."

¶ 51                                    Best-Interests Hearing

¶ 52    After respondent was found unfit a best-interest hearing was conducted. The trial court found it in the best interests of M.L.W-B. and L.W. that respondent's parental rights be terminated. Respondent's appeal does not allege any error with respect to the trial court's best interest determination.

¶ 53                              Written Termination Hearing Orders

¶ 54    Termination Hearing Orders were entered involuntarily terminating B.W.'s parental rights based on the trial court's findings that:

        " [B.W.], *** by clear and convincing evidence, is unfit pursuant to 705 ILCS 405/2-9 and 750 ILC 50/1(D), on the following specific grounds: (b) failed to maintain reasonable degree of interest, concern and responsibility (m) failed to make reasonable efforts or progress ***.

        It is in the best interests of the minor to terminate mother's parental rights."

¶ 55    Respondent timely appealed. Both the State and the Guardian filed responsive briefs. This appeal followed.

¶ 56                                         ANALYSIS

¶ 57    Respondent raises five issues on appeal pertaining only to the unfitness hearing. Specifically, respondent argues she was prejudiced because the trial court: (1) improperly applied 'law-of-the-case doctrine" and thus failed to fully consider all the evidence; (2) admitted over objection out-of-court statements about [respondent] telling her daughter about a kidnapping plot; (3) erred in eliciting testimony from caseworker Adams; (4) erred in admitting State's exhibit 33 consisting of L.W.'s therapy reports; and (5) made findings that respondent was an unfit parent which were against the manifest weight of the evidence. We address respondent's arguments as well as her position that the cumulative impact of the alleged errors warrants reversal of the trial court's judgment. For the reasons set forth below, we affirm the trial court's judgment finding respondent unfit.

¶ 58                          I.  Law-Of-The-Case Doctrine

¶ 59    Respondent argues "this matter must be remanded where the trial court repeatedly expressed concern that it could not make an independent assessment of the evidence because prior rulings made by another judge had a preclusive effect on the issues presented." Law-of-the-case doctrine provides that once the court decides a question of fact or law in a case that was raised or could have been raised on appeal, that decision continues to govern the same issue in subsequent stages in that same case. *Lurie v. Wolin*, 2017 IL App. (1st) 161571, ¶ 26.

¶ 60    All parties correctly concede that the trial court was not bound by the prior permanency and visitation rulings made by the prior judge in this case when ruling on respondent's fitness. Accordingly, the only question at issue is whether the trial court applied the law of the case doctrine, an incorrect legal standard. Whether the correct legal standard has been applied in a case is an issue of law which we review *de novo*. *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 23.

- 15 -

¶ 61    Neither party disputes that at various points during the trial, the trial court inquired as to whether the law-of-the-case doctrine applied.  Respondent points to the trial court's various inquiries; however, cites to nothing in the record to suggest the trial court actually applied the doctrine in reaching its conclusion that respondent was unfit.

¶ 62    Prior to closing arguments the trial court referenced rulings in this case by the prior judge finding no substantial progress and determining the children should not be sent home and stated "one of the issue I have, am I not bound as the law of the case by [the prior judge's] findings? So I would like you to address that ***."  As requested, the issue was addressed with each party's counsel stating the law-of-the-case doctrine did not apply.

¶ 63    Furthermore, upon review of the trial court's oral ruling as to respondent's unfitness, we see no indication that the court's finding respondent unfit was because the court believed it was bound by any earlier orders in the case.  In fact, aside from noting that respondent was never permitted unsupervised visits, the trial court made no reference to any prior court orders. Instead, the trial court discussed the witnesses and their credibility as well as the evidence in the context of unfitness pursuant to Grounds B and M and found respondent unfit by clear and convincing evidence.

¶ 64                                      II.  Unfitness Finding

¶ 65    Having concluded that the trial court did not apply the law-of-the-case doctrine in assessing respondent's fitness, we next address respondent's argument that the trial court's finding respondent unfit was against the manifest weight of the evidence.  Respondent argues reversal is warranted because (a) the trial court failed to specify a particular nine-month period in which respondent failed to make reasonable efforts; (b) the trial court erred in barring admission of testimony about the adjudicatory findings; (c) the finding that respondent failed to make

reasonable efforts was not supported by the evidence; (d) the finding that respondent failed to show interest was not supported by the evidence; and (e) the written termination order was inconsistent with the trial court's oral ruling. We disagree and affirm the trial court's unfitness determination under Ground B.

¶ 66     The Juvenile Act, 705 ILCS 405/1 *et seq.* (West 2018), and the Adoption Act, 750 ILCS 50/1 *et seq.* (West 2018), control proceedings to terminate parental rights. Where the State seeks termination of parental rights without parental consent, the trial court must make two separate and distinct findings as follows: (1) it has been proven by clear and convincing evidence that the parents are "unfit persons" within the meaning of section 1(D) of the Adoption Act, 750 ILCS 50/1(D) (West 2018); and, (2) it has been proven by a preponderance of the evidence that it would be in the best interest of the children to terminate parental rights and to appoint a guardian and authorize that guardian to consent to an adoption. 705 ILCS 405/2–29(2) (West 2018); see also *In re D.T.,* 212 Ill. 2d 347, 366 (2004). As previously noted, respondent does not challenge the trial court's finding under the second step that it was in the best interests of the children to terminate respondent's parental rights, to appoint a guardian, and to authorize that guardian to consent to adoption of M.L.W-B. and L.W.

¶ 67     As to the first step, parental fitness, respondent was found to be an unfit person as defined by the Adoption Act pursuant to Grounds B and M. While respondent was found unfit on both grounds, "any one ground, properly proven, is sufficient to enter a finding of unfitness. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). At this stage of termination proceedings "the focus is on the parent's conduct relative to the ground or grounds of unfitness alleged by the State." *In re D.T.,* 212 Ill. 2d at 364. The clear and convincing evidentiary standard applies. 750 ILCS 50/1(D) (West 2018).

¶ 68  The standard of review is manifest weight of the evidence. *In re N.T.*, 2015 IL App (1st) 142391, ¶ 27.  Under this standard, the trial court will not be reversed unless "the opposite conclusion is clearly evident from review of the evidence presented." *In re Nicolas C.*, 2017 IL App (1st) 162101, ¶ 25.  This court discussed the applicable standard of review in the context of an unfitness hearing stating:

> "Since the juvenile court was in the best position to view and evaluate the parties, its decision is entitled to great deference, and a finding of unfitness will not be reversed unless it is against the manifest weight of the evidence.  [Citation.]  A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent.  [Citation.]  Additionally, due to the delicacy and difficulty of child custody cases *** wide discretion is vested with the juvenile court to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied.  [Citation.]"  (Internal quotations omitted). *In re N.T.*, 2015 Il App (1st) 142391, ¶ 27.

¶ 69  Having established the applicable standard of review, we address respondent's argument that the trial court's unfitness finding under Ground B was against the manifest weight of the evidence.

¶ 70  Ground B of the Adoption Act provides that a parent may be found unfit for the:

> "Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare."  750 ILCS 50/1(D)(b) (West 2018).

¶ 71  "A finding of unfitness under ground (b) is based on a subjective analysis" and a parent may be found unfit on any one of its three elements alone – failure to maintain a reasonable degree of (1) interest; or (2) concern; or (3) responsibility as to the child's welfare. *In re Nicolas*

*C.*, 2017 IL App (1st) 162101, ¶ 24. "[G]round (b), unlike ground (m), has no time constraints that limit a court's consideration of a parent's unfitness" and thus "a court may consider the parent's conduct in this respect *in toto* and is not forced to analyze only certain time periods of the parent's behavior." *Id*. at ¶ 21.

¶ 72    The focus is on the reasonableness of the parent's efforts and not her success. *Id*. at ¶ 24. "Factors to be applied toward an analysis of these elements include consideration of a parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, such as inquiries into the child's welfare." *In re C.E.*, 406 Ill. App. 3d 97, 108 (2010). "If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest and responsibility, depending upon the content, tone, and frequency of those contacts under the circumstances." *In re Adoption of Syck*, 138 Ill. 2d. 255, 279 (1990). Failure to complete service plan objectives can also be considered as evidence of a parent's failure to demonstrate a reasonable degree of responsibility for the child. *In re T.Y.*, 334 Ill. App. 3d 894, 906 (2002).

¶ 73    A parent's conduct is to be examined in the context of that parent's relevant circumstances to include "difficulty in obtaining transportation, the parent's poverty, statements made by others to discourage visitation, and whether the parent's lack of contact with the children can be attributed to a need to cope with personal problems rather than indifference towards them." *In re C.E.*, 406 Ill. App. 3d at 108-09. "However, simply because a parent demonstrates some interest or affection toward her children does not render her fit under this ground; rather, her interest, concern, and/or responsibility must be reasonable." *In re Nicolas C.*, 2017 IL App (1st) 162101, ¶ 24. Based on the evidence, we cannot conclude the trial court's finding respondent unfit for failure to maintain a reasonable degree of interest, concern, or

responsibility for M.L.W-B. and L.W.'s welfare was against the manifest weight of the evidence. See *In re Nicolas C.*, 2017 IL App (1st) 162101, ¶ 25.

¶ 74    While respondent did visit the children and traveled a significant distance to do so, her own therapist reported that these visits were not consistent.  Respondent testified that she had not seen M.L.W-B. and L.W. from late September early October 2017 through the time of her trial testimony on May 31, 2018.  Caseworker Alcazar testified that, despite not having visitation as set forth above, since December 6, 2017, respondent had not contacted her to see how the children were doing, schedule visits with the children, or otherwise inquire about the children. When respondent did communicate with Alcazar to cancel her October 2017 and December 2017 visitation, respondent did not ask about M.L.W-B. or L.W.  Respondent also did not send any cards, gifts, or letters to the girls.

¶ 75    Prior to this seven-month period there was a period of approximately one year where respondent did not visit the children due to the suspension of her parenting pursuant to court order.

¶ 76    Respondent also testified that she did not reach out to the girls' foster parents directly to find out about the girls because she did not feel the foster-mother was forthcoming with information.  However, respondent could have followed up with the caseworkers or reached out to M.L.W-B. and L.W. directly with letters or telephone calls as suggested by respondent's therapist.

¶ 77    We acknowledge that aside from these two periods, respondent made an effort to attend her supervised visitations absent illness or transportation issues.  However, the service plans reflected that respondent's visits were inconsistent because of these issues.

¶ 78    Moreover, even when visiting with M.L.W-B. and L.W., reports from service providers and caseworkers reflect that respondent did not make an effort to engage with the children other than just showing up at the visits.  Caseworker Adams testified there were issues with respondent "talking more or less to the people from Passages [rather] than interacting with the girls."  An August 2016 court report stated that "[d]uring visits [respondent] had been observed being inappropriate, screaming at the children and she is not very active with her children during visits."  Adams testified respondent would sit a lot during the visits and was physically unable to interact with the children.  Adams also noted in service plans that she needed to redirect respondent to watch her children.  Respondent's therapist noted that respondent needed to exhibit a willingness to engage her children in activities stating respondent "is unable to take initiative and actively engage them in an activity or plan for the visit."  When Blume addressed respondent's lack of engagement with her children, respondent replied that she "will do things with them when they return home."

¶ 79    Furthermore, caseworker Adams noted inappropriate promises were made to the children during visits.  Caseworker Alcazar testified that she observed one visit between respondent and the girls in October 2017 shortly after being assigned to the case.  During that visit, respondent engaged in inappropriate discussions about her boyfriend, the pending child protection case, and blamed the foster parents for various incidents in M.L.W-B. and L.W.'s presence.  Alcazar had to remind respondent that these topics were inappropriate to discuss in front of the girls.  Alcazar planned to observe a second visit in October; however, respondent called to cancel the visit due to lack of transportation.  As noted above, during the conversation, respondent did not ask any questions about M.L.W-B. or L.W. nor did she inquire as to how they were doing.

¶ 80    When parenting coaching services were recommended to address the issues respondent was having engaging with the children, respondent failed to complete the program.

¶ 81    In her brief, respondent blames her visitation issues on the location of the visits which she argues distracted the girls from interacting with respondent.  However, reports from service providers and caseworkers along with respondent's own testimony that she wanted the visits "to be somewhere active" such as "the zoo or a park instead of sitting down and eating with them" contradict respondent's argument.  Nevertheless, we note that a change in the location of the visits would not address issues concerning inappropriate comments made by respondent in front of the children, respondent's apparent inability to appropriately discipline M.L.W-B. and L.W., or her inability to consistently visit with the children or actively engage with them due to respondent's various health issues.

¶ 82    As to respondent's ability to show a reasonable degree of responsibility for the girls' welfare, we also note that despite describing her on and off partner, L.S., as being abusive, she stated her childcare plan for the children when they returned home was to have L.S. care for them.  With respect to these childcare plans, Blume noted respondent's inability to understand the potential risk to her children due to her choice of unhealthy partners.

¶ 83    Given this evidence, we cannot say the opposite conclusion – that respondent did maintain a reasonable degree of interest, concern, or responsibility as to M.L.W-B. and L.W.'s welfare – is clearly evident.  See *In re Nicolas C.*, 2017 IL App (1st) 162101, ¶ 25.

¶ 84    Because we affirm the trial court's finding of unfitness under Ground B, we need not address respondent's claims of error with respect to the trial court's finding of unfitness pursuant to Ground M.  See *In re C.L.T.*, 302 Ill. App. 3d 770, 777 (1999) (holding that where there was sufficient evidence to support parental unfitness on one statutory ground, the reviewing court

"need not address the issue of whether the State met its burden of proving the other grounds alleged in the petition."). This includes respondent's arguments that the trial court's finding pursuant to Ground M was not support by the evidence; the court failed to specify a particular nine-month period; the court improperly barred admission of testimony about adjudicatory findings which respondent argues were relevant to respondent's reasonable efforts under Ground M; and that the written termination order was inconsistent with the trial court's oral findings because the trial court "made no finding that [respondent] failed to make reasonable progress" as required pursuant to Ground M.

¶ 85                    III. Adams' Testimony Regarding Kidnapping

¶ 86    Respondent argues she "was prejudiced where the trial court admitted over objection out-of-court statements about [respondent] telling her daughter [M.L.W-B.] about a kidnapping plot" arguing (a) "the statements were not corroborated," (2) "the contents exceeded any limited course of investigation exception[,]" and (3) "the admission of those statements was highly prejudicial when the State used the contents to argue in closing that [respondent] was an unfit mother." We disagree and find that caseworker Adams' statements were not hearsay offered for the truth of the matter asserted, but instead was sufficiently limited testimony used to explain why Adams suspended respondent's visitation.

¶ 87    Whether evidence was properly admitted by the trial court is reviewed for an abuse of discretion. *In re D.M.*, 2016 IL App (1st) 152608, ¶ 15. Under this standard, an abuse has occurred where the trial court " 'acted arbitrarily without the employment of conscientious judgment, or in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted.' " *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41 quoting *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). Respondent cites

*People v. Aguilar*, 265 Ill. App. 3d 105, 109 (1994), as an exception to the generally applied abuse of discretion standard in cases where the trial court's exercise of discretion was frustrated by an erroneous rule of law in which case a *de novo* standard is applied. Respondent argues; however, that the trial court erred under both standards. We review for an abuse of discretion and find no error. See *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (reviewing the trial court's exclusion of evidence for abuse of discretion holding "[t]he decision whether to admit evidence cannot be made in isolation" and requires the trial court to "consider a number of circumstances that bear on the issue, including questions of reliability and prejudice.").

¶ 88    "[T]estimony about an out-of-court statement which is used for a purpose other than to prove the truth of the matter asserted in the statement is not hearsay." (Internal quotations omitted.) *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 88. This includes statements offered to explain the listener's subsequent course of conduct. *Id*. However, such statements may not be made without limitation and courts must balance "the need to show course of conduct *** against potential prejudice to the opposing party." (Internal quotations omitted.) *Id*. at ¶ 89. Accordingly, the statements "should be admitted only to the extent necessary to provide that explanation and should not be admitted if they reveal unnecessary and prejudicial information." *Id*. However, "when a trial court is the trier of fact a reviewing court presumes that the trial court considered only admissible evidence and disregarding inadmissible evidence in reaching its conclusion." *People v. Naylor*, 229 Ill. 2d 584, 603 (2008).

¶ 89    When Adams was questioned about the reasoning for suspension of respondent's visitation the following exchange occurred:

> "The State:        What do you recall occurred that resulted in you as the
> [case]worker suspending mother's visits?

Adams:            I received a call stating [respondent] stated that she --

Public Defender:  Objection, foundation, hearsay.

The State:        It's not being offered for the truth.  She has to know what the issue is so she can follow-up on it and investigate it, so I think you will hear from her that something was brought to her attention and she followed up on it.

The Court:        Do you know when you suspended the visit in 2016?

Adams:            I believe it was August 2016.

The Court:        Why did you suspend it?

Adams:            Because I had got a call stating that the child stated that [respondent] was going to kidnap her.  I went down to Bourbonnais, went to the school and had a conversation with [M.L.W-B.] by herself.  She stated that [respondent] said she was going to take her.  I asked her were the people from Passages who supervised the visits present?  She said they were right there.  Following that I called Passages to ask them about did they hear the conversation with [respondent] stating that?  They said they didn't hear anything.  So I suspended the visits until I could find the same company but another set of people to monitor the visits because I believe the people monitoring had become very familiar with [respondent] –

Public Defender:  Objection as to what she --"

¶ 90    As set forth in the State's response at trial to counsel's objection, we agree that Adams' statements were not hearsay offered for the truth of the matter asserted, but instead were offered to explain why Adams suspended respondent's visitation.  Accordingly, the trial court did not abuse its discretion in admitting the testimony.

¶ 91    Respondent cites *In re Zariyah A.* and argues that Adams' statements "were not limited to showing the course of investigation or explaining why visits were temporarily suspended." In support of this argument, respondent highlights the decision's reference to criminal cases which have limited police officer testimony to the fact that a conversation had occurred resulting in subsequent action and precluding testimony as to the substance of that conversation. *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 88. We note that this is not a criminal case and find *Zariyah A.* distinguishable for additional reasons.

¶ 92    In *Zariyah A.* the respondent argued the trial court abused its discretion in admitting and relying on the caseworker's testimony as to the substance of her conversation with a mental health clinician confirming the respondent was diagnosed bi-polar in adjudication proceedings. *Id*. at ¶¶ 1, 86. In that case, when the respondent's counsel objected to the testimony at trial, the GAL and the State argued the testimony was only offered to show the caseworker's course of conduct with respect to her referral of services to the respondent. *Id*. at ¶ 86. However, in closing arguments, the State and the GAL relied on the testimony for the truth of the matter asserted and both conceded that it was referenced by the trial court in its ruling finding the minors neglected. *Id*. ¶¶ 86-87. Accordingly, this court assessed whether the testimony was hearsay and concluded it was, but that the erroneous admission was harmless because it was cumulative of other competent evidence. *Id*. ¶¶ 88-94.

¶ 93    Here, we find the statements were sufficiently limited. The testimony explained why the visitation was suspended, namely that new supervisors were required because they claimed they had not heard a comment concerning kidnapping M.L.W-B. where M.L.W-B. claimed respondent made the statement right in front of them. As to the kidnapping comment, we see no prejudice to respondent where respondent's own counsel elicited the same information while

examining respondent. Specifically, in response to her counsel's questioning about the basis for the suspension of her visits respondent stated "[a]pparently one of my daughters told the foster mother that I planned to kidnap her" which respondent denied doing. As to the conversation with the supervisors, we do not see how their denying such comments were made would prejudice respondent. We also cannot say it was an abuse of discretion to allow Adams' volunteered impressions that the supervisors had become too familiar with respondent. We note that Adams' impressions about the supervisors is not hearsay and it directly explained why Adams then acted to suspend respondent's visitation; she needed to find new supervisors.

¶ 94    We also disagree with respondent's characterization of the State's questioning here as prosecutorial misconduct. Respondent argues the State improperly elicited opinions about the credibility of the caseworkers. This was not the case. The State was merely asking Adams to explain why respondent's visitation had been suspended, a question respondent's counsel also inquired of respondent. In fact, Adams' statements were ultimately in response to the court's question "Why did you suspend [respondent's visitation]?" Neither the State nor the court inquired as to whether Adams thought the supervisors were lying as to whether they heard the kidnapping comments and Adams testimony did not answer this question. Adams only suspended the visitation because she believed respondent and the supervisors had become too familiar. It is entirely plausible that Adams believed the supervisors, but simply wanted to make M.L.W-B. more comfortable. In any event, whether she believed them or not is of no relevance because the out-of-court statements concerning both the kidnapping statements and whether the supervisors heard such comments were not offered for the truth, but only to explain why visits were suspended - a point that was clearly argued to the trial court in response to respondent's counsel's objection.

- 27 -

¶ 95    In contrast to *In Zariyah A.*, here the State, in closing did not argue respondent told M.L.W-B. she was going to kidnap her or that respondent actually intended to do so. In fact, the only reference to Adams' testimony at issue during closings was made by respondent's counsel. Furthermore, nothing in the record suggests that the trial court relied on Adams' testimony for the truth of the matter asserted and we presume the trial court did not rely on the testimony for anything other than to explain why Adams suspended respondent's visitation. See *Naylor*, 229 Ill. 2d at 603.

¶ 96                    IV.  Trial Court's Questioning of Caseworker Adams

¶ 97    Respondent argues she was prejudiced "when the trial court stepped far outside the bounds of neutral advocacy by eliciting a sham 'opinion' to evade a well-founded objection to the lack of foundation for the caseworker's assertation that [respondent] made negative out of court statements." At trial caseworker Adams testified as to concerns about how respondent spoke to the girls about their foster parents which was reported by the girls during her conversations with them. When attempting to lay a foundation for these conversations, Adams testified she could not recall when the conversations took place. The trial court prohibited Adams from testifying as to the contents of the conversations unless there was an appropriate foundation. Thereafter, the following exchange of which respondent complains, occurred:

> "The State:          But you had many conversations with the girls?
>
> Adams:              Yes.
>
> The State:          And did they express to you anything that was concerning?
>
> Adams:              I know they stated that - -
>
> Public Defender:    Objection, foundation.

> The Court:    After you had many conversations with the children, did you come away with an opinion as to anything negative mother might have been saying to the kids?
>
> Adams:    [Respondent] did not like the fact that the girls called her visit mom.  And I think it was just because they related seeing her to visiting her. She did not like that name, and she did not like the fact that they had begun calling the foster parents mom and dad, and the kids would tell me that.
>
> The Court:    I don't find it shocking the kids started doing that, and I don't find it shocking [respondent] was upset about it.  Whether it was right or wrong is irrelevant."

¶ 98    Respondent's counsel did not object to the trial court's questioning; however, all parties acknowledge that while such failure ordinarily prohibits review, where the conduct of the judge is the subject of the objection the forfeiture rule is less rigid.  *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 25.  Accordingly, we will examine this issue on its merits.

¶ 99    The propriety of a trial court questioning a witness is reviewed for an abuse of discretion which will be found where the court " 'acted arbitrarily without the employment of conscientious judgment, or in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted.' "  *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41 quoting *In re D.M.*, 336 Ill. App. 3d at 772.  "A trial judge may question witnesses to elicit truth, clarify ambiguities in the witnesses' testimony, or shed light on material issues." *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 26.  "The trial judge is given wider latitude in examining witnesses in a bench trial, where the risk of prejudice is less and the court's inquiries are compatible with its role as fact-finder. [Citation.]  However, the trial court must not

depart from its function as judge and may not assume the role as advocate for either party. [Citation.]"  (Internal quotations omitted.)  *Id.* at ¶ 26.

¶ 100    We do not believe it was improper for the trial court to ask questions of Adams.  See *id*. However, the specific question was improper because it attempted to elicit a lay witness opinion based on inadmissible hearsay.  See Ill. R. Evid. 602 (eff. Jan. 1, 2011); see also *People v. Maisonet*, 138 Ill. App. 3d 716, 718-19 (1985) (holding a lay witness may not base their opinion on inadmissible hearsay).  Nevertheless, as the State points out, Adams did not respond with her opinion as to anything negative respondent might have been saying to the children, but instead testified as to what the girls told her respondent had discussed with them, specifically respondent not liking (a) being called "visit mom' by the girls as well as (b) the girls referring to their fosters parents as mom and dad.  Accordingly, we find the error harmless.  *In re Brandon A.*, 395 Ill. App. 3d 224, 235 (2009) (holding that error is harmless where the result would have been the same had the error not occurred).

¶ 101    Adams' statements were responsive to the State's earlier line of questioning prohibited by the trial court due to lack of foundation as to the timing of these conversations.  While respondent's counsel did not again interpose an objection, because the statements were elicited in response to the trial court's questioning we will examine the merits of whether the admission of these statements constituted error and, if so, whether it was harmless or reversable error.  See *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 25.  As to the admission of Adams' alleged offending statements, we are not prepared to say the trial court acted arbitrarily or exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted. See *In re D.M.*, 2016 IL App (1st) 152608, ¶ 15 (errors as to admissibility of evidence are reviewed for abuse of discretion); see also *In re N.T.*, 2015 IL App (1st) 142391, ¶ 41.

¶ 102   However, even if we were to find error, we would conclude that the error was harmless. See *In re Brandon A.*, 395 Ill. App. 3d at 235 (holding that error is harmless where the result would have been the same had the error not occurred).  As detailed above, even without this testimony, there was sufficient evidence to justify the trial court's conclusion that respondent was unfit.  Moreover, there is nothing in the record to suggest the trial court relied on this testimony in finding respondent unfit and we presume the trial court did not rely on any inadmissible evidence.  See *Naylor*, 229 Ill. 2d at 603.  In fact, the record reflects the trial court was unmoved by the testimony stating it was not shocked by the children's behavior or that respondent was upset by it noting "[w]ether it was right or wrong is irrelevant."

¶ 103                                    V.  L.W.'s Therapy Reports

¶ 104   Respondent argues exhibit 33, consisting of L.W.'s therapy reports which included a mental health assessment of the child, an individual treatment plan for the child, and progress notes from July 2016 to May 2018, should not have been admitted into evidence because (1) they were not relevant to the fitness hearing and (2) they constituted inadmissible hearsay.  We disagree that the trial court erred in admitting exhibit 33 into evidence.

¶ 105   "The admission of evidence is within the discretion of the circuit court and its ruling will not be reversed absent and abuse of discretion."  (Internal quotations omitted.)  *In re Kenneth J.*, 352 Ill. App. 3d 967, 980 (2004), quoting *Smith v. Silver Cross Hospital*, 339 Ill. App. 3d 67, 76 (2003).  "An abuse of discretion may be found only where no reasonable man would take the view adopted by the circuit court."  *Smith*, 339 Ill. App. 3d at 74.  Under this standard, we must "determine whether the circuit court acted arbitrarily without employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored

recognized principles of law so that substantial prejudice resulted." (Internal quotations omitted.) *In re Nylani M.*, 2016 IL App (1st) 152262, ¶ 34.

¶ 106   To be admissible, the evidence must be relevant. *In re Kenneth J.*, 352 Ill. App. 3d at 980; See also Ill. R. Evid. 402 (eff. Oct. 15, 2015). "Evidence is relevant if it tends to prove a fact in controversy or renders a matter in issue more or less probable." *In re Kenneth J.*, 352 Ill. App. 3d at 980; see also Ill. R. Evid. 401 (eff. Oct. 15, 2015).

¶ 107   At issue was respondent's fitness to parent a child in an action to terminate her parental rights pursuant to Grounds B and M of the Adoption Act. We find the therapy reports relevant to considerations under Ground M, specifically, a parent's failure to make reasonable progress. See 750 ILCS 50/1(D)(m) (West 2018). As to reasonable progress, the overall focus in evaluating a parent's progress toward return of the child is "at all times, on the fitness of the parent in relation to the needs of the child." *In re. C.N.*, 196 Ill. 2d 181, 215 (2001). The court in *In re C.N.* reasoned that:

> "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id*. at 216-17.

¶ 108   Thus, "relevant evidence with respect to reasonable progress includes: evidence in connection with compliance with service plans and court directives; evidence in connection with correction of the conditions leading to removal; and evidence in connection with any other

conditions that may be disclosed through subsequent investigation that a parent must address in achieving the goal of return." *In re Kenneth J.*, 352 Ill. App. 3d at 981.

¶ 109    We cannot say the trial court abused its discretion by overruling respondent's relevancy objection and admitting the therapy reports into evidence.  At trial, respondent objected to the admission of exhibit 33 arguing only that the documents were not relevant to the unfitness hearing.  In support of her position, respondent, in her briefs, specifically objects to the therapist's recordings of "numerous out-of-court statements made by the foster mother which asserted that [L.W.'s] problems were caused or exacerbated by visits with her natural mother" citing to three pages of the 72 page exhibit.

¶ 110    In response to respondent's relevance objection at trial, the State argued that L.W.'s therapy reports were introduced because "there was some indication *** through testimony about [L.W.'s] reaction after visits with the mother, and these documents as relates to the progress notes reflect some of that concern by the therapist."

¶ 111    Consistent with the State's objection, L.W.'s reaction to respondent's supervised visits, as identified in L.W.'s therapists progress notes are relevant to respondent's progress in complying with her service plan goals.  A reoccurring issue referenced in respondent's service plans concerned mother's need to participate in the supervised visits with her children.  Several evaluation narratives contained in the service plans discussed mother's issues disciplining the children and failure to utilize parenting skills taught in her completed parenting classes resulting in emotional visits where the children became upset.

¶ 112    The progress notes in exhibit 33 provide insight into L.W.'s special needs requiring consistency in discipline and consequences for bad behavior and inform whether respondent had the ability to make progress in this area given these special needs and respondent's inability to

employ skills learned during parenting classes as set forth in the service plans' various

narratives. Thus, we cannot say that no judge would find L.W.'s therapy records relevant to

respondent's reasonable progress specifically her compliance with service plans and being able

to address L.W.'s special needs which were disclosed through subsequent investigation that

respondent would have to address. See *Id*. at 981.

¶ 113 As to respondent's hearsay argument, we agree with both the State and the Guardian who

argue this issue has been waived. We find this is also true of respondent's argument that the

evidence was cumulative. At trial, respondent objected to the admission of exhibit 33 on the

basis of relevance only and argues for the first time on appeal that the therapy reports constitute

inadmissible hearsay and cumulative evidence. Illinois Rule of Evidence 103(a) provides that:

> "error may not be predicated upon a ruling which admits or excludes
>
> evidence unless a substantial right of the party is affected, and ***
>
>> in case the ruling is one admitting evidence, a timely objection or
>>
>> motion to strike appears of record, stating the specific ground of
>>
>> objection, if the specific ground was not apparent from the context
>>
>> ***." Ill. R. Evid. 103(a) (eff. Oct. 15, 2015).

¶ 114 Furthermore, "[i]n civil *** trials where the court has not made a previous ruling on the

record concerning the admission of evidence, a contemporaneous trial objection *** must be

made to preserve a claim of error for appeal." Ill. R. Evid. 103(a) (eff. Oct. 15, 2015). As

respondent failed to make contemporaneous hearsay and cumulative objections at trial when

State's exhibit 33 was offered into evidence, we deem these issues forfeited.

¶ 115 Even if respondent had properly raised a plain-error argument on appeal to avoid

forfeiture of these issues, because we find no error occurred as to the admission of exhibit 33 into

evidence, we note respondent could not meet her burden under the plain-error doctrine. See

*People v. Johnson*, 218 Ill. 2d 125, 139 (2005) (holding "there can be no plain error if there is no

error").

¶ 116    We further note that even if error had occurred with respect to the trial court's admission

of exhibit 33, the error was harmless and thus would not constitute grounds for reversal. See

*Jefferson v. Mercy Hospital & Medical Center*, 2018 IL App (1st) 162219, ¶ 39 (holding

"[e]rroneous evidentiary rulings are only a basis for reversal if the error was 'substantially

prejudicial and affected the outcome of the trial.' "); see also Ill. R. Evid. 103(a) (eff. Oct. 15,

2015) ("[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a

substantial right of the party is affected"). As detailed above at length, the evidence

overwhelmingly supports the trial court's unfitness determination and thus we find no prejudice.

¶ 117    Moreover, as respondent points out "when a trial court is the trier of fact a reviewing

court presumes that the trial court considered only admissible evidence and disregarding

inadmissible evidence in reaching its conclusion." *Naylor*, 229 Ill. 2d at 603. Here, in

overruling respondent's objection to the admission of exhibit 33, the trial court responded "Well,

I will admit it for what they are worth" and there is nothing in the record to suggest that any

improper evidence was considered by the trial court in its unfitness determination.

¶ 118                              VI. Cumulative Error

¶ 119    Respondent argues the cumulative impact of the errors alleged on appeal exacerbated the

prejudice to respondent warranting reversal of the trial court's unfitness finding. However, as set

forth above, we found only two errors by the trial court which related to the same testimony and

found neither of these errors reversable. Generally, there is no cumulative error where the

alleged errors do not amount to reversible error on any individual issue and where no error

occurred at all, there can be no reversal based on cumulative error. *People v. Green*, 2017 IL

App (1st) 152513, ¶ 118. Accordingly, we do not find respondent was prejudiced by cumulative

error warranting reversal of the trial court's judgment.

¶ 120                                  CONCLUSION

¶ 121   For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 122   Affirmed.